50

1 **ANDREW C. BAILEY**
  2500 N. Page Springs Rd
2 Cornville, AZ 86325
3 928 634-4335
  *Self-Represented Litigant*
4

**FILED**

JAN 2 2 2010

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

5

6 **IN THE UNITED STATES BANKRUPTCY COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8 | In Re: | Chapter 11 |
| ANDREW C. BAILEY, | Case #: 2:09-bk-06979-PHX-RTBP |

9 **Debtor**

10 ANDREW C. BAILEY,
   Respondent

11
                                        **DECLARATION IN SUPPORT
12 vs                                   OF DEBTOR'S OPPOSITION
                                        TO MOTION FOR STAY
13 THE BANK OF NEW YORK MELLON, F/K/A    RELIEF
   THE BANK OF NEW YORK AS TRUSTEE      (INCLUDING EXPERT
14 FOR CWALT, INC. ALTERNATIVE LOAN      WITNESS DECLARATION)**
   TRUST 2007- HY4 MORTGAGE PASS-
15 THROUGH CERTIFICATES, SERIES 2007-
   HY4, its assignees and successors in interest,   Subject property:
16 Movant                               2560 N. Page Springs Rd,
                                        Cornville, AZ 86325

17                                      Countrywide Account #: 164999184

18         **DECLARATION IN SUPPORT OF DEBTOR'S
19         OPPOSITION TO MOTION FOR STAY RELIEF
           (INCLUDING EXPERT WITNESS DECLARATION)**
20

21 I, Andrew C. Bailey, am the Debtor and Respondent in the above-captioned matter and

22 declare and state as follows:

23

24

25 1. The grounds for my opposition are based on months of intensive research, forensic

1  analysis, and consultation with mortgage, banking industry and securitization experts.

2  2. In my opposition to the instant action, I am raising a fundamental issue of fact. I have

3  been informed by expert industry analysts that Movant is not my creditor. I have an expert

4  witness who will testify to this at an evidentiary hearing.

5

6

7  3. I am therefore requesting an evidentiary hearing based on the rules of evidence and

8  founded on common discovery and enforcement in obtaining relevant information about my

9  loan.

10

11  4. I am seeking the identity of my creditor and a full accounting of the subject Transaction,

12  to wit, the identity(ies) of the creditor(s) who actually funded the subject loan, and the

13  production of documents and names, addresses and phone numbers of people who can

14  testify under oath at an evidentiary hearing.

15

16  5. I have secured the services of a mortgage audit firm, which has performed a forensic

17  review of the Transaction. However, Movant and Movant's partners in the securitization

18  scheme are the sole party(ies) in possession of undisclosed information, making it difficult

19  or impossible for an outside party to determine the facts.

20

21  6. I have secured the services of an expert in securitized residential mortgage products and

22  mortgage-backed securities to appear at an evidentiary hearing as my expert witness.

23  Exhibit "A" (Resume of Expert Witness)

24

25

7. The expert witness has executed a Declaration of his findings, opinions and recommendations. Exhibit "B" (Declaration of Expert Witness)

8. On September 21, 2009 and again on December 10, 2009 I served Qualified Written Requests pursuant to the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 and Debt Validation Letters pursuant to the Fair Debt Collection Practices Act 15 U.S.C §1692 first on BAC Home Loans Servicing LP and then on Movant in a diligent attempt to clarify the above issues. No response to any of the subject requests has been received to date. Apparently it is common practice on the part of the foreclosing institutions and their attorneys to ignore these statutes.

9. As a result of Movant's non-compliance with the above Federal statutes, I have had no alternative but to initiate adversary proceeding 2:09–ap–01728–RTBP. I served my First Set of Interrogatories and First Request to Produce Documents on Movant on January 11, 2010 as set forth in Exhibit "C" and await answers. Response is required within 30 days.

10. As my expert witness will illustrate, Movant has failed to prove that it is the holder of all rights under the Note, which would permit the legal holder thereof to declare a default which would trigger a foreclosure.

11. Further, Movant, as "Trustee" for unnamed 'Certificateholders' of a series of mortgage-backed securities, has failed to demonstrate that it, and not the Certificateholders, is the party with the true ownership interest in the Mortgage the subject of this action, or that the Certificateholders have acceded or legally assigned their rights to and under the subject Mortgage to Movant, specifically the right to seek a foreclosure.

12. As such, Movant has not demonstrated that it has suffered an actual or threatened injury as a consequence of any default, which distinct and palpable injury is legally required under applicable Federal and State law in order for Movant to satisfy the legal prerequisite to prove that it has a sufficient personal stake in and legal standing to institute the foreclosure on the Property.

13. As a severance of the ownership and possession of the Note and Mortgage has occurred and as the true owner and holder of both the Note and Mortgage are unknown as a result of one or more alleged assignments and the parsed sale of certain rights under the Note, Movant is legally precluded from foreclosing on the Property unless and until it can demonstrate full legal standing to do so.

14. I am asking that the court impose a temporary restraining order enjoining Movant from taking any further foreclosure or other action before the resolution of the foregoing, thereby maintaining the status quo until discovery has been conducted.

15. Several other entities have previously laid claim to the subject property via foreclosure action and/or proof of claim, namely Countrywide Home Loans and BAC Home Loans Servicing LP. There is confusion as to which of these entities if any is a real lender, creditor, holder in due course, party in interest or current beneficiary.

16. Formal discovery in the adversary action may be the only way to determine the facts. I have, however, endeavored to avoid expensive and time-consuming litigation by invoking

1  the RESPA and the FDCPA and their federally-mandated disclosure requirements, to no

2  avail. I am asking the Court to enforce the requirements of the statute.

3

4  17. Movant directly acknowledges that the subject loan was securitized, a process legally

5  dubious in and of itself. Nevertheless, my creditor remains undisclosed. Movant assuredly

6  did **not** fund my loan. Movant is therefore not my creditor.

7

8

9  18. Notwithstanding the above, it is also probable that the obligation was paid off by credit-

10  default insurance or Federal bailout triggered by a Notice of (alleged) Default on the

11  Transaction, or by a threshold percentage of defaults in a portfolio or trust of securitized

12  loans of which my loan was part. This vital information is included in the disclosures

13  required under the RESPA and the FDCPA. This information continues to be withheld by

14  Movant, in violation of Federal and State law and to the detriment of myself and my

15  legitimate creditors.

16

17

18  19. Despite representation of Movant to the contrary, the matter of whether or not I have

19  equity in the property remains unknown and unknowable until the above disclosures are

20  made. If the obligation under the note was paid off at or before the alleged closing, or was

21  subsequently paid off in any of a number of ways including but not limited to federal

22  bailout or credit default insurance, I may have nothing but equity in the property.

23

24  20. The subject property is an essential element in my reorganization and the future

25  development of my Retreat Center business. It is one of the two contiguous homes used to

1   house facilitators, attendees and other guests and clients.

2

3   21. I believe I have excellent prospects for an effective reorganization once my creditor

4   disputes have been resolved and I can resume promotional activities with respect to my

5   businesses. I am presently negotiating a contract for regular monthly use of the Center,

6   which should provide a solid basis for future success.

7

8

9

10

11   Dated January 20th, 2010

12

13

14

15

16

17

18   Andrew C. Bailey, Debtor in Pro Per

19

20

21

22

23

24

25

**Certificate of Notice**

Copy of the foregoing was
mailed on January 22, 2010 to:

Office of the US Trustee
230 N. First Avenue, Suite 204,
Phoenix, AZ 85003

Trustee

Leonard McDonald, Esq
Tiffany & Bosco, PA
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016
(Attorney for Wells Fargo Bank NA)

Dean Prober, Esq
Polk, Prober & Raphael
PO Box 4365
Woodland Hills, CA 91365-4365
(Attorney for BAC Home Loans Servicing, LP)

Ronald Horwitz, Esq
Jaberg & Wilk, PC
3200 N. Central Avenue, suite 2000
Phoenix AZ 85012
(Attorney for Wells Fargo Bank NA)

Gerald O'Meara, Esq.
Gust Rosenfeld PC
1 South Church Avenue, suite 1900
Tucson, AZ 85701-1620
(Attorney for Bank of New York Mellon)

# RESUME

## NEIL F. GARFIELD

*4980 S Alma School Rd A-2*
*480-895-5443 Fax: 772-594-6244*
*email: Ngarfield@msn.com*

### SUMMARY:

Varied and integrated professional and business background in the following areas --- *investment banking, derivative security baskets, electronic funds transfer, management, information systems, accounting, auditing and law.*

- ✓ Currently teaching lawyers, judges, legislators, and layman in the Garfield Continuum Seminars for Attorney CLE credit and general information, appearing on numerous radio and TV broadcasts, Garfield is the Editor in Chief of livinglies.wordpress.com, a blog site that has reached over 1 million visits and is widely regarded as the premier resource on the internet for foreclosure cases, opinion, links to law reviews, practice guides and current events the foreclosure of securitized mortgages. Garfield draws on his Wall Street experience and trial lawyer years combined with intensive analysis of derivatives, securitized financial products and personal relationships developed over the years which give him unique insights into the realities of Wall Street in the Mortgage Meltdown of 2001-2009.

- ✓ Starting out on **Wall Street**, he became proficient in the language and conduct of highly complex financial transactions. At an early age, Mr. Garfield personally handled the negotiations leading to successful **mergers, acquisitions, multimillion dollar financing, IPO's, secondary** offerings, and private financing for dozens of companies.

- ✓ He then achieved his **MBA and JD degrees with distinction**, and began a 35 year law and business consulting career.

- ✓ Following his law career he assumed control of two **public companies** for which he successfully structured financing and merger programs, **creating and implementing novel business and marketing plans for information systems** storage and retrieval including a mobile platform for backfile conversion for clients who were installing imaging systems. Initial clientele included **Fannie Mae, Chemical Bank, the Securities and Exchange Commission, the New Mexico Legislature,** and a host of Universities and Government agencies. Under his direction the publicly traded stock increased market value from **$150,000 to $45,000,000** in nine months.

- ✓ Following that engagement, he bought out the **ATM/POB** portfolios of several different companies now consolidated under EFT Systems, Inc., d/b/a American Bank Card, which now manages more than **$30 million** in electronic payments for retail sales, an **increase of 250%**. The EFT's **business expanded** to include **prepaid debit cards, ACH origination, and technology consulting** to banks and independent sales organizations.

- ✓ As president of American Bank Card, he created, funded and implemented the business plan for a cooperative marketing channel to community banks for technology sales, deployment, and support. He is now **General Counsel to the SMART cooperative of community banks** that includes a newly launched bank network, and a host of electronic funds transfer services on behalf of bank and private enterprise clients.

Exhibit A

**WALL STREET BACKGROUND:**

With a family securities business in his background (Garfield and Co. Members NYSE, AMEX etc.) Mr. Garfield started off as a trainee securities analyst and quickly rose to be Director of Research and Director of Mergers and Acquisitions at well-respected brokerage houses on Wall Street. At the end of this portion of his career, Mr. Garfield concurrently studied for his **MBA** *magna cum laude*. He was licensed as a registered representative 1968-1972.

**LAW CAREER**

Following his investment banking career, Mr. Garfield moved to Florida where he studied law and was awarded his **JD degree** *cum laude*. Concurrently with his studies, he was the business manager for a small law firm in Fort Lauderdale.

A member of the **Florida Bar** since 1977, he devoted most of his time to practicing law from 1977 through 1992. He is also a member of the **Federal Trial Bar**, the Federal Bankruptcy Bar, and several national and local committees. Until his semi-retirement in December, 1992 he was also a member of The Florida Trial Lawyers Association, the American Bar Association and the West Broward Bar Association. He has served on committees for the Florida Bar and was a volunteer, early in his legal career for the Florida Bar Committee for mental disability law reform, where he represented individuals incarcerated for reasons associated with mental disabilities (pro bono).

He received his Undergraduate Degree from Dickinson College in 1968, his MBA from Iona College in 1974, Magna Cum Laude, and his Juris Doctor from Nova University Center for the Study of Law in 1977, Cum Laude.

The concentration of his law practice was in the areas of commercial transactions, commercial litigation, condominium law, administrative law and bankruptcy. He has been the recipient of **numerous academic awards** in business and law, including:

**LAW**
*American Jurisprudence Award in Torts
*American Jurisprudence Award in Commercial Transactions
*American Jurisprudence Award in Federal Jurisdiction
*Horn Book Award for outstanding scholastic achievement from Nova University Law Center (first out of 175 students)

**BUSINESS, ACCOUNTING AND TAXATION**
*Medal for Academic Excellence 1974, MBA, (first in a two-year program of 159 students)
*Who's Who Among Students in American Universities and Colleges - 1974 - Iona College

Concurrently with his law career, he was frequently retained as a **business consultant** to small and medium sized businesses. Mr. Garfield assumed the Presidency of two public companies in 1992 and was charged with the responsibility of finding and closing on mergers, acquisitions, financing, and developing the business plans of those entities through the acquisition of qualified personnel. At the commencement of his engagement, neither company had any assets other than loosely defined business plans. In an 18 month period these companies **raised over $2.5 million in cash, made acquisitions for real estate valued in excess of $8 million,** and acquired several operating companies. In addition, the business plans of the companies were refined, placing DIS as the leading company in the field of backfile conversion (conversion of hard copy documents into computer storage) and consulting on information systems, storage and retrieval. During that tenure he managed 45 employees.

1968 - 1969: Director Research Department, and Registered Representative, Spingarn, Heine Company, Members, NYSE, AMEX, etc.

1968 Trainee - Security Analyst and Registered Representative, A.L. Stamm & Company, Members, NYSE, AMEX, etc.

# TEACHING AND PUBLIC SPEAKING EXPERIENCE:

1. Iona College **Graduate School** of Business Administration: Taught individual classes in a variety of management, auditing and accounting courses as substitute for usual professor.

2. Broward Community **College**: Taught variety of subject dealing with law and business for adult education. Guest lecturer on business, law, and psychology of learning and performance.

3. **Seminars**: Conducted numerous seminars in law, business and personal development. Methods employed: lecture, Socratic and experiential. Garfield Continuum Seminars on Foreclosure Defense, Litigation and Securitized Mortgages is qualified for Continuing Legal Education Credits in 26 states varying from 6.5 to 9.5 credits.

4. **Trials**: Every trial is an educational seminar for the jury or judge. In the course of 17 years of practice, has appeared as lead counsel in over 2000 contested hearings, bench trials and jury trials and approximately 20 oral arguments on appeal.

5. **Radio**: In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television**: Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

# PERSONAL:

Married December 6, 2003 to Joyce Molloy Children: Marc Andrew Garfield DPM (40, prior marriage, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (35, prior marriage, Director of Website for Citizens property Insurance, Florida, Danielle Kinorah Garfield, age 20, attending Broward Community College, Cocnut Creek, FloridaAmerican Heritage School in Plantation, Florida. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world.

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Debtor in Pro Per*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andrew C. Bailey<br><br>     Debtor | **Chapter 11** |
| | **Case# 2:09-bk-06979-PHX-RTBP** |
| vs.<br><br>BANK OF NEW YORK MELLON F/K/A<br>BANK OF NEW YORK<br>COUNTRYWIDE HOME LOANS,<br>BAC HOME LOANS SERVICING, LP<br>ET AL | **DECLARATION OF NEIL FRANKLIN GARFIELD AS EXPERT WITNESS**<br><br>Subject property:<br>2560 N. Page Springs Road,<br>Cornville, AZ 86325<br><br>Subject transaction:<br>Countrywide #164999184 |

STATE OF ARIZONA     )
                           )   ss.
County of Maricopa     )

Neil Franklin Garfield, deposes and states unsworn under penalty of perjury as follows:

1.     I am over the age of eighteen years and qualified to make this affidavit.

2.     I have been a licensed member in good standing of the Florida Bar FBN 229318

1

Case 2:09-bk-06979-RTBP   Doc 1335  Filed 01/22/10  Entered 01/25/10 15:38:12   Desc
Main Document    Page 11 of 50
01/25/2010

since May 31, 1977

3.    I am the author and editor of www.livinglies.wordpress.com a blog site on the

Internet which contains most of the public records and public domain reports,

articles, books, treatises and documentation upon which I rely for my opinion in this

case. I am the author of the manuals and workbooks that are used to accompany

the workshops and seminars that present under the name GARFIELD

CONTINUUM. Those manuals are the nearest thing available in the marketplace to

treatises involving foreclosure of securitized residential mortgages. In addition I have

an indirect interest in Foreclosure Defense Group that performs forensic analysis of

loan documents, title examinations, analysis of securitization documentation, and

prepares Qualified Written Requests, Debt Validation Letters and demand letters for

clients, most of whom are attorneys licensed in the jurisdiction in which the subject

property is located. Foreclosure Defense Group sponsors the Garfield Continuum

Seminars in which I teach laymen and lawyers to understand civil procedure,

evidence, motion practice, discovery, ethics, securitization theory and practice,

defensive and offensive strategies with servicers, MERS, Trustees, mortgage

brokers, "originating lenders," investment bank underwriters, special purpose

vehicles and bond issuance. Subjects also include elements of property law,

contract law, negotiable instruments, Uniform Commercial Code, tort law and

consumer protection under Federal and State enabling legislation.

4.    I have recently testified at deposition as an expert in the class action suit in Case

2

No.: 3:09-cv-180-ECR-VPC, United States District Court District of Nevada,[1] to

render opinions in the topic areas related to the securitization of mortgage loans,

derivative securities, the securities industry; real property law, Uniform Commercial

Code practices, predatory lending practices, Truth in Lending Act requirements, loan

origination and underwriting, accounting in the context of securitization and REMIC

entities, Special Purpose Vehicles, Structured Investment Vehicles, pooling and

servicing of securitized loans, assignment and assumption of securitized residential

mortgage loans, creation of trusts under deeds of trust, pooling agreements, and

issuance of asset backed securities and specifically mortgage-backed securities by

special purpose vehicles in which an entity is named as trustee for the holders of

certificates of mortgage backed securities, the economics of securitized residential

mortgages during the period of 2001-2008, appraisal fraud and its effect on APR

disclosure, usury, exceeding the legal limit for interest charged, non-judicial

foreclosure of securitized and non-securitized residential mortgages, and judicial

foreclosure of securitized and non-securitized residential mortgages, all particularly

as to the laws of the State of Arizona, California, Florida and Ohio, based upon the

---

[1]     JOSEFA S. LOPEZ, JOSE TRINIDAD CASAS, MARIA C. CASAS, LYNDON B.GRAVES, TYRONE
EVENSON, MICHELLINA EVENSON, BRYAN GRAY, HELEN GRAY, PATRICK FRANKOSKI, and CHRISTOPHER PETERNELL,
individually and on behalf of a class of similarly situated individuals, Plaintiffs vs. EXECUTIVE TRUSTEE SERVICES, LLC.;
COUNTRYWIDE HOME LOANS, INC., a New York corporation; MERSCORP, INC., a Virginia  corporation; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC., a subsidiary of MERSCORP, Inc., a Delaware corporation; RECONTRUST,
SAXON MORTGAGE SERVICES, INC., a Pennsylvania corporation; GALE GROUP dba T.D. FINANCIAL SERVICES dba T.D. SERVICE COMPANY,
SECURITY UNION TITLE INSURANCE COMPANY, CAPITAL ONE dba CHEVY CHASE BANK, NATIONAL DEFAULT
SERVICING CORPORATION, FEDERAL HOME LOAN MORTGAGE CORPORATION, a Virginia corporation; FEDERAL
NATIONAL MORTGAGE ASSOCIATION, a District of Columbia corporation; GMAC MORTGAGE, L.L.C., a Delaware corporation;
NATIONAL CITY  MORTGAGE, a foreign company and a division of NATIONAL CITY BANK, a subsidiary of National City
Corporation; NATIONAL CITY CORPORATION,  a Delaware corporation and a subsidiary of PNC Financial Services, Inc.; PNC
FINANCIAL SERVICES, INC., a Pennsylvania corporation; J.P. MORGAN CHASE BANK, N.A., a New York corporation;
CITIMORTGAGE, INC., a New York corporation; HSBC MORTGAGE CORPORATION, U.S.A., a Delaware corporation; AIG
UNITED GUARANTY CORPORATION, a foreign corporation; WELLS FARGO BANK, N.A., a California corporation, d/b/a WELLS
FARGO HOME EQUITY and d/b/a WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., a California
corporation; BANK OF AMERICA, N.A., a Delaware corporation, and GE MONEY BANK, an Ohio corporation;  JOHN AND JANE

credentials in the Resume attached hereto.

5.      I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. The cost of my preparation, analysis, review, meetings, teleconferences, appearances and all other work is $500 per hour plus all out of pocket expenses all of which must be prepaid regardless of outcome.

6.      With respect to Case #: 2:09-bk-06979-PHX-RTBP and related matters in administrative and judicial proceedings I have received and reviewed some of the pleadings and memorandums, some of the orders entered, conferred with the forensic analyst that reviewed the purported loan closings on the subject properties, the closing loan documents and additional pleadings relating to the subject "loan" transactions. I have confirmed the information related to me through my review of said closing documentation, as well as my own internet searches with respect to the parties purporting to be the "Lender" (see end-note 1) in the transaction subject to the instant matters.

7.      My opinions are based upon public records and documentation written or prepared by the purported originating parties that are named or designated as a "lender"[i] or "beneficiary" or "Payee" or "trustee" in the contracts and deed executed by the homeowner in this case, as well as the documentation that in my opinion was relevant to the securitization of the financial product sold to the homeowner as a residential home loan and simultaneously or contemporaneously sold as a financial

DOES I-X;  BLACK AND WHITE PARTNERSHIP I-X.

product to an investor. In my opinion, both financial products (i.e., the transaction with the property owner and the transaction with the creditor/investor who purchased mortgage-backed bonds from an entity that was not disclosed at closing to the property owner) were securities, and neither set of securities were properly registered or regulated. The information that would reveal the identity(ies) of the creditor(s) has been withheld from Debtor. It can only be said, in the context of an absence of answers to the qualified written requests that the creditor can be described but not identified. The initiating parties in foreclosure are not creditors and do not appear to have ever advanced money, goods or services, nor did they enter into any arrangement wherein they expected payment to be due to them. Rather, as is apparent from the information at hand, the payment was, as is always the case, due to the creditor who advanced the money or his/her/its successor. The parties have assumed the identity of "beneficiary", "lender" and/or "payee" despite the fact that the loan was securitized which means that it was sold to investors who were the source of the advance of funds. Since the sale of bonds to the investor is customarily a transaction that precedes the sale of the financial product sold to the property owner, it is my opinion that it may be fairly and reasonably assumed that at the time the documents were executed, the creditor was the bond holder, contrary to the nominal designations on the closing documents.

8.     The customary practice in securitization of residential mortgage loan products was to withhold information concerning the identity of the creditor and to withheld the disclosure of profits and fees made on the multiple yield spreads and premiums paid

thereon, amounting in this case to a substantial portion of the total principal of the loans themselves, using average data from the marketplace congruent with the time and place of these transactions. The actual information that would provide the identity of the creditor and thus allow inquiry for a complete accounting and audit of the subject transactions is in the sole care, custody and control of the loan servicer or another intermediary conduit in the securitization chain, including but not limited to the Trustee or depositor for the Special Purpose Vehicle that re-issued the homeowner's note and encumbrance as a derivative hybrid debt instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

8.1. According to information from Debtor, Debtor has made unsuccessful attempts through industry standard letters requesting the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

8.2. At such time that the intermediary participants in the securitization comply with the requests for said information, I will be able to identify with certainty the true owner of the alleged obligation, thus enabling me to provide the court with a complete description of the entire transaction starting with the creditor and ending with the debtor and any co-obligors or other conditions added during the process of securitization of the loan product sold to the property owner. In such event the identity of the creditor(s) and the opportunity to obtain a full accounting

will be present. Until then, I am dealing with only partial information in that there are four parts to the required accounting:

8.2.1. The debits and credits arising from the moment of the closing of the subject transactions

8.2.2. The debits and credits arising from transactions between the property owner and each servicer

8.2.3. The debits and credits arising from transactions with third parties either during or after the first phase of securitization was completed

8.2.4. The debits and credits arising from transactions in which insurance proceeds or other third party proceeds were received and distributed including the Federal Reserve, Federal Agencies, the U.S. Department of the Treasury, The FDIC and other unknown and therefore unnamed parties.

8.3. Until such time as the full accounting is available and subject to audit, it is impossible to know the amount due from the property owner on the obligation that might have been created at the alleged closing of the subject transactions.

8.4. Without knowing the amount due on the obligation it is therefore impossible to determine whether a default exists, and if so, who is suffering financial loss as a result of the default.

8.5. Until such time that the identity is revealed by Defendants, I must rely upon internet searches making certain presumptions regarding the subject loan transactions. The main presumptions are that the standards of the industry were followed in the securitization of the subject transaction and that the subject

transactions were in fact securitized. I arrive at those conclusions both from information appearing in the record and from my knowledge that where these particular parties are involved, the probability of securitization is nearly 100%. The prospectus that was filed with the SEC apparently covering the parties and time period consistent with the Bailey "Loan" Transaction reveals explicit terms and conditions upon which I base my opinions.

8.6.    In my opinion the party identified as "LENDER" "originated" loans acting as a mortgage broker and not as a mortgage lender. The real lender was the source of funds advanced for the funding of the loan. I rely upon common definitions of creditor, debtor, lender etc. found in bankers' glossaries, law dictionaries, and through my practical experience and training in securities analysis, underwriting, my training in law school, my training in business school and my experience on Wall Street, and as a practicing lawyer in commercial transactions and commercial litigation.

8.7.    Answers are required either in response to the qualified written request or through discovery. Confirmation of my opinions would include but not be limited to the manner in which each firm in the securitization reflected the transaction on its own financial records. In most cases it appears merely as fee income or profit on sale which would confirm that the party never was a creditor.

8.8.    It appears as though all originated loans were subject to previously existing agreements including Pooling and Service Agreements and Assignment and Assumption Agreement, in which the originated loans were already pledged

or conveyed to third parties (investors/creditors/LENDERS) at the time of Plaintiff's "closing."

8.9.  At each level of securitization a successor "Trustee" was named purporting to acquire all powers of the "Trustee" before the loan was transmitted, transferred, sold or hypothecated to another party. In each case there does not appear to actually be a "Trust" as the beneficiaries of each "Trust" are either ambiguous or not present at all.

8.10.  In each case the nominal "Trust" actually contained no assets, the same having been transferred to yet another entity PRIOR to the existence of the subject transaction.

8.11.  In the case of the entity that issued bonds to the creditors as mortgage backed securities, in each case the mortgages to back those securities did not yet exist. In each case, though, the body of the bond indenture explicitly conveys a percentage interest in the "pool" to the creditor forming what appears to be a general partnership, with the indenture in reality being a partnership or operating agreement.

8.12.  In each case, the "Trustee" is named but then described and its powers circumscribed increasingly as one reads through the enabling document, such that it appears that the party named as "Trustee" is in actuality an agent with very limited powers.

8.13.  In many cases and in particular with the parties involved in this litigation, they were the recipients of proceeds from the Federal Reserve that "purchased"

the mortgage backed securities, thus making the Federal Reserve the creditor in whole or in part in these subject transactions.

8.14.     Typically all such indentures create a hybrid security that is both bond and equity, to wit: the bond provides for a stated interest rate of return and provides ownership of a percentage of a pool of assets comprised of residential loans, which would most certainly have included the subject loan.

8.15.     In many cases the "trusts" were disbanded and no longer exist as legal entities. Without further disclosure from these parties, it is impossible to know whether the vehicles used for processing the creditor's investment in mortgage loans still exists and if so, its status.

8.16.     In most cases there have been multiple assignments or transmittals of documents or rights with regard to multiple parts of the securitization chain. These various stakes or revenue streams could include but not be limited to servicing rights, foreclosure rights, collection on the note, collection of federal bailout grants or loans, collection of payments from co-obligors added during the securitization of the Debtor's note, and collection of payments on credit default swaps which frequently are leveraged as much as thirty times the original value of the note(s) in the pool of assets subject to the CDS. Thus it is not known by the servicer or originator whether the Plaintiff/Debtor's note is or ever was in default – a fact that can only be known by the creditor and which is either not known or being withheld by the securitization parties in the case at bar. Based upon published reports, in my opinion, there is a very high probability that all or

part of the Debtor's note was paid in whole or in part by third parties, that different parties came to claim rights to enforce the mortgage and note and that the intention to split the note from the mortgage while heretofore unusual in the marketplace was commonplace in securitization of residential loans. Hence, it is my opinion that the holder of the note, either singular or plural, are not the same parties as those who purportedly hold the mortgage and that this was a result that was intended by the mortgage originator and the parties to the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

8.17.    The above facts result in a conflict of interest, claims and stakes by numerous parties contained within the securitization chain, some of which parties are known and some of which are not known to Plaintiff/Debtor and therefore not known to the undersigned declarant.

8.17.1.    It also appears that the standard industry practice of creating a yield spread premium between the lender and originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, the Plaintiff/Debtor's loan was sold to the investors at a gross profit (i.e. a second yield spread premium) to the participants in the securitization chain of at least 35% of the total principal balance of the note. In my opinion, this disclosure does not appear on any of the closing documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real

Estate Settlement Procedures Act. Further, no information appears in Plaintiff/Debtor's closing documentation that would have caused him to inquire about such a premium, which exceeds any yield spread premium ever paid prior to the securitization of residential mortgages. In my opinion, it is equally probable that the investors were kept unaware that less than 2/3 of their investment was actually going to fund Plaintiff/Debtor's loan and other similarly situated. Based upon direct conversation with Plaintiff/Debtor, he also was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

8.18.     Additional information submitted by licensed appraisers still in good standing with the licensing board along with public records documentation in other states indicates a pattern of behavior consistent with the subject "loan" Transaction, corroborates the existence of the second yield spread premium and shows that the appraisal on the property, upon which the property owner reasonably and legally relies as per the requirements of law and regulation, was artificially inflated per direct instructions from the purported "lender" or other firms in the securitization chain ultimately receiving their instructions from the investment banking firm that did the underwriting of the securities sold to the creditors/investors and which issued the instructions regarding the underwriting of the purported loans to homeowners including the subject transaction.

9.     My opinions are also based upon substantial knowledge, training, experience,

study and analysis of securities, securities regulation, securitization, derivatives and various precursor asset protection or bankruptcy remote schemes in commercial and real estate settings.

10.     My opinions are also based upon direct interaction via telephone, email or written correspondence with many intermediary conduits and some underwriters of the reissued securities to investors who bought mortgage-backed securities.

10. My opinions are based upon certain assumptions regarding securitization of the subject loan which can only be verified by review and analysis of the actual securitization documents, applicable credit default swaps or other insurance or hedge products, and audit, review and analysis of the effect, if any, of federal bailout money received by the creditor, (i.e., the party who actually advanced the funds from which the subject obligation was funded) or any parties who received such funding or money relating to or arising from the subject homeowner obligation created by the financial loan product sold to the homeowner in this instance.

11.     I express the following opinions that are offered within a reasonable degree of factual certainty and financial probability based upon filings with the Securities and Exchange Commission, prior knowledge of intermediary/conduit parties in the subject transactions, and the known participants in this loan and its securitization:

11.1.     The subject real estate and securities transactions were securitized, to wit: The subject homeowner and the unidentified Lender(s)/investor(s) entered into a transaction which was represented as a loan transaction whereby the investor(s) lent money to the homeowner and other homeowners similarly situated.

11.2.    In terms of the real estate portion of the transaction, the homeowner was

the borrower and the investor was the lender. The investor is still the lender if

the investor has not sold, transferred or alienated the hybrid mortgage backed

security and if the investor has not been directly or indirectly paid through credit

default swaps, with or without subrogation, or paid through a federal program

with or without subrogation. Since no such instruments appear on record, any

right of subrogation would appear to be equitable. Thus for purposes of this

declaration, the unknown and undisclosed investor(s) constitute the only Lender

presumed to exist until the undersigned is presented with contrary evidence

admissible in a court of law.

11.3.    The only parties that can claim to be creditors (or a holder in due course of

the note) are those who would suffer a monetary or pecuniary loss resulting from

non-payment of the obligation either because they advanced the actual funds

from which the Bailey Loan Product was funded or because they would have

paid value prior to default or notice of default. These parties fall within one or

more of the following classifications:

11.3.1.    Investors who purchased asset backed securities in which

ownership of the LOANS was described with sufficient specificity as to at

least express the intent to convey ownership of the obligation as evidenced

by the promissory note and an interest in real property consisting of a

security interest held by an entity that was described as the beneficiary of a

Trust created by an instrument entitled Deed of Trust;

THEREFORE I CONCLUDE THAT THE CREDITORS ARE THE
UNIDENTIFIED INVESTORS AND ALL OTHER PARTIES ARE
INTERMEDIARY OR REPRESENTATIVE OR DISINTERESTED.

11.4.    Title is affected by the following:

11.4.1.    Insurers that paid some party on behalf of said investors;

11.4.2.    counter-parties on credit default swaps;

11.4.3.    conveyances or constructive trusts arising by operation of law
through cross collateralization and over-collateralization within the
aggregate asset pools or later within the Special Purpose Vehicle tranches
("tranches" is an industry term of art referring to the types of division within a
Special Purpose Vehicle);

11.4.4.    the United States Treasury Department through the Troubled
Assets Relief Program in which approximately $700 billion has been
authorized and paid to purchase or pay the obligation on "troubled"
(non-performing) assets of the LOANS. The subject "loan" is part of the
class of assets targeted by TARP;

11.4.5.    the United States Federal Reserve, which has extended credit on
said troubled assets and has exercised options to purchase said troubled
assets;

11.4.6.    any other party that has traded in mortgage backed securities from
the aggregated pools or securitized tranches containing interests in the
LOANS.

12.     However, it is unlikely that any holder in due course exists because in the

practice of securitization as it was followed universally within the investment banking

community, the recorded encumbrance was never effectively or constructively

transferred because it was never executed in recordable form nor was an effort

made to create such a document by the parties to the instant case until they decided

to issue a notice of delinquency, notice of default, notice of sale, and Petition for

Unlawful Retainer and Writ of Possession.

12.1.     Hence any transfer or purported transfer of the note was not accompanied

by the encumbrance being incident to said transfer because applicable recording

statutes require an interest or change of interest in real property to be recorded.

Hence the loan product sold to the subject homeowner included a promissory

note that was evidence of a real obligation that arose when the transaction was

funded but lost its negotiability, thus barring anyone from claiming holder in due

course status.

12.1.1.     The negotiability of the note is negatively affected by (1) the

splitting of the note and mortgage as described above, (2) by the addition of

terms, conditions, third party obligors and undisclosed profits, fees,

kickbacks all contrary to existing federal and state applicable statutes and

common law and (3) knowledge of title and chain of title defects in the

ownership of the note, beneficial interest in the encumbrance, and position

as obligee on the obligation originally undertaken by the subject

homeowner. .

12.2.    None of the known participants in the subject securitization chain (including but not limited to Defendants herein) falls within any of the classifications of "Lenders" or holders in due course on the subject financial products sold to the subject homeowner as LOANS. A Lender or Creditor is a party who advances or creates money for the benefit of another with the expectation of receiving it back, usually with a profit denominated as "interest." The investor fits this definition. All other parties including the putative foreclosing parties in the case at bar, fall into the class of intermediaries or conduits, playing the role of payment mechanism or document repository or record keeper.

12.3.    None of the known securitization participants has suffered any financial loss relating to the LOANS, nor are they threatened with any future loss if foreclosure remains enjoined by the automatic stay.

12.4.    None of the known securitization participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the LOANS.

12.5.    None of the known securitization participants will suffer any monetary loss through non-performance of the LOAN.

12.6.    All of the known securitization participants received fees and profits relating to the LOANS.

12.7.    The existence and identity of the real parties in interest was withheld from the homeowner in the closing and servicing of the LOANS, and since.

13.    Several transactions have purportedly taken place regarding the Bailey "Loan."

None of them appear to have actually conveyed anything since all conveyance documentation was effective simultaneously or contemporaneously with closing of the subject transactions. The investors are still the source of funding, the securities were sold to the investors with conveyance of ownership of the "Loan" product purchased by Bailey, and the transfers claimed by "successor" parties all occurred AFTER the conveyance was effective in favor of the investors. Since the loans were conveyed before the transfers for good consideration, I conclude that none of the other parties posses any title, color of title, or claim under the note and mortgage executed by Bailey.

14.    Further, the award of title to any of these other parties would be in derogation of the title and claims of the investors who are the only and actual sources of funding/consideration. The interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation were purportedly transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. In my opinion, the "Lender" in securitized loans is only a nominee for an undisclosed principal. The transaction with the homeowner is subject to a pre-existing contractual relationship wherein the investors advanced the cash for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers (not protected by attorney client privilege or the attorney work product privilege) in which they have been informed that any nominee that does not advance

cash for funding the loan and does not receive any payments on the obligation in particular allows multiple parties to make claims on the same property from the same borrower, using the same note and the same security interest.

14.1.     The intended monetary effect of the use of such a nominee was to provide obfuscation of profits and fees that were disclosed neither to the investor who put up the money nor to the borrower in this LOAN. In the case at bar, it is my opinion based upon a reasonable degree of certainty (beyond more likely than not) that the total fees and profits generated were actually in excess of the principal stated on the note --- which is to say that investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.

14.1.1.     The only way this could be accomplished was by preventing both the borrower and the investor from accessing the true information, which is why the industry practice of nominees like the private MERS system were created. Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services". Therefore it is possible and even probable that the data from the closing was entered into the MERS electronic registry and that an assignment was executed to MERS purportedly giving MERS some power over the obligation, the note and/or the encumbrance. As a general rule in securitized transactions and especially where MERS is named as nominee, documents of transfer

(assignments, endorsements, etc.) are created and executed

contemporaneously with the notice of default thus selecting a participant in

the securitization chain to be the party who initiates collection and

foreclosure.

15.    The notice of default in the case at bar was in all probability substantially before

any fabrication or creation of documents of transfer and before any such documents

were recorded. Further it does not appear that any such documents were executed

in recordable form under the laws of the State and in accordance with the local

administrative rules governing recordation of instruments that purport to show an

interest in real estate. Hence it is my opinion, as above, that the existence of any

document of transfer in this case is inconsistent with the authority – apparent or

actual --- to execute same without some additional documentation establishing a

foundation for the document of transfer (assignment, endorsement etc.). No such

document having been produced the inescapable conclusion is that no authority

exists and that if permitted to move forward with a foreclosure or foreclosure sale, a

title defect would be created beyond the current cloud on title, thus rendering the title

permanently unmarketable without the entry of a court order from a court of

competent jurisdiction declaring the rights of all stakeholders --- potential and

otherwise. This opinion should not be construed to deny the existence or validity of

the note, mortgage or underlying obligation. It is meant solely to convey the opinion

that none of the existing parties known to the homeowner have any authority,

apparent or otherwise, to declare the obligation in default or to pursue collection on

the note or enforcement of the encumbrance.

15.1.    Based upon experience with the parties claiming an interest in the

financial product sold to the homeowner in this case and their behavior and

method of operating as demonstrated in other cases, it is my opinion that none

of the known participants, individually or collectively, has knowledge or has done

due diligence to determine the existence of a default as to the Lender, nor

whether the note, security interest or obligation has been extinguished or paid in

whole or in part by co-obligors, insurers and/or federal bailout.

16.    In the securitization of the LOAN, the rights of various named mortgagees,

assignees and/or Trustees have each been superseded by succeeding conduits

including the alleged Trustee or officer of the Special Purpose Vehicle that issued

bonds to the investor(s) who at least at some point in time material to the subject

transaction with the homeowner in the subject transaction were holders of mortgage

backed securities. The powers of said officer or Trustee are limited to ONLY what

the certificate holders authorize. The transaction with the Lender(s) in which they

advanced "loan" money for the subject homeowner's loan product, was

consummated most likely before the transaction with the homeowner or was subject

to binding agreements between various principals in the securitization scheme that

pre-dated the transaction with the homeowner. Therefore, the actual and

undisclosed Lender(s) was the investor(s) who advanced the cash and who was

known by the securitization participants, and therefore was the only party(ies)

entitled to claim first lien either legally or under equitable subrogation. Accordingly,

the only potential party to a foreclosure wherein the purported creditor alleges

financial injury and therefore a right to collect the obligation, enforce the note or

enforce the security instrument is either a party who has actually advanced cash and

stands to lose money or an authorized representative who can disclose the principal,

provide proof of service or notice, and thus show such authority.

17.     In my opinion, as above, and with a reasonable degree of factual and legal

certainty, the disclosed principals in the securitization chain are not the Lender(s)

nor are they agents for the Lender(s). In my opinion, as stated in this paragraph,

these parties are interlopers or impostors whose design is to take title to property

they have no right to claim, and to enforce a note which is evidence of an obligation

that is not owed to them but rather to another. The details of this information,

whether the special purpose vehicle still exists, whether the investor(s) has been

paid in full through federal or insurance payment, are known only to these

securitization participants.

18.     In my opinion the attorneys for the known securitization participants do not have

any authority to represent the Creditors, and could not represent them due to the

obvious conflict of interest, to wit: the investor(s) upon learning that a substantial

amount of their advance of cash was pocketed by the intermediaries and now is left

with a mortgage whose nominal value is far below what was paid, and whose fair

market value is far below the nominal value, would have potential substantial claims

against the securitization participants for fraud, breach of contract, and other claims.

19.     I have also reviewed, for the past 40 years, published Financial Accounting

Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit, which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet (or on the ledgers used to prepare the balance sheet) but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization participant in this case.

20.     In my opinion, with a high degree of certainty, the Plaintiff/Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Plaintiff/Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Lender

as beneficiary under the Mortgage Deed as distinct from a third party named as Payee on the promissory note and the same or other third party named as beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

FURTHER, AFFIANT SAYETH NAUGHT.

Signed on January 17, 2010

/s/ Neil Franklin Garfield, Esq.

_____

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Debtor in Pro Per*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | **Chapter 11**<br>**Case #: 2:09-bk-06979-PHX-RTBP**<br>(Associated Case # 2:09-ap-01728-RTBP) |
| ANDREW C. BAILEY<br>Debtor/Plaintiff | **DEBTOR'S FIRST SET OF** |
| | **INTERROGATORIES AND FIRST** |
| Vs | **REQUEST FOR PRODUCTION OF** |
| | **DOCUMENTS** |
| BANK OF NEW YORK MELLON, f/k/a<br>BANK OF NEW YORK<br>Movant/Defendant | (Related to Docket #82) |
| | Subject Property:<br>2560 N Page Springs Rd<br>Cornville, AZ 86325 |

## DEBTOR'S FIRST SET OF INTERROGATORIES

## AND FIRST REQUEST FOR

## PRODUCTION OF DOCUMENTS

Pursuant to Rule 33 and Rule 34 of the Federal Rules of Civil Procedure, Debtor requests

Movant/Defendant BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK to

answer the following Interrogatories and produce documents in accordance with the

following Request for Production of Documents.

Exhibit C

## DEFINITIONS

1. BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK includes any and all persons and entities presently or formerly acting for or in concert with BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK.

2. BAC HOME LOANS SERVICING LP includes any and all persons and entities presently or formerly acting for or in concert with BAC HOME LOANS SERVICING LP, COUNTRYWIDE HOME LOANS, COUNTRYWIDE BANK, or BANK OF AMERICA.

3. "Document" includes each record held in BANK OF NEW YORK MELLON, f/k/aBANK OF NEW YORK's possession or generated by BANK OF NEW YORK MELLON, f/k/aBANK OF NEW YORK.

4. The word "document(s)" includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, and should be construed in the broadest sense permissible. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "document(s)" includes the original and any non-identical copy and also every draft and proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition, the word "Document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "e-

mail," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files.

5. The word "person(s)" includes not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trusts, groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof.

6. As used herein, any reference to any "person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries, affiliates, divisions, and predecessors and successors in interest.

7. The words "you," "your", "defendants" or "movants" refer to defendants, defendant-intervenors, movants, and their agents, representatives, attorneys, experts, and all other persons acting or purporting to act on behalf of Movants.

8. The singular of each word shall be construed to include its plural and vice versa, and the root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to include each other.

9. The words "and" as well as "or" shall be construed both conjunctively as well as disjunctively.

10. The word "each" shall be construed to include "every" and vice versa.

11. The word "any" shall be construed to include "all" and vice versa.

12. The present tense shall be construed to include the past tense and vice versa.

13. The masculine shall be construed to include the feminine and vice versa.

14. The words "knowledge," "information," "possession," "custody," and "control" of a person shall be construed to include such person's agents, representatives, and attorneys.

15. The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and shall not indicate limitation to the examples or items mentioned.

16. The phrase "reflect, refer, or relate to" means reflecting, referring, relating to, regarding, discussing, concerning, constituting, mentioning, pertaining to, alluding to, or associated with.

17. The words "to present" mean to the date on which you respond to these interrogatories and requests.

## INSTRUCTIONS

1. Unless otherwise specified, if your response in regard to a portion of the time period addressed in any interrogatory differs from your response in regard to another portion of such period, provide a response for each such portion and indicate the period of time to which each response relates.

2. Deem any reference to a non-natural person to include the legal predecessors of such non-natural person.

3. When an interrogatory asks you to "describe" or "identify" a document, provide the following information with respect to each such document:

a. The date appearing on such document; or if it has no date, so state and give the date or approximate date such document was prepared, produced, created, or came into being;

b. Any identifying or descriptive code number, file number, title or label of such document;

c. The general nature or description of such document;

d. The name of the person(s) who signed, authored, produced or created such document;

e. The name of the person(s) who prepared such document if different from the name provided pursuant to subpart (d) of this instruction;

f. The name of the person(s) to whom such document was addressed and the name of each such person other than the addressee to whom such document, or copy or reproduction

thereof, was given or sent;

g. The name of the person or entity having present possession, custody and/or control of such document;

h. The present location of such document;

i. If such document was, but is no longer in your possession or control, state what disposition was made of such document, the reason for such disposition, and the date thereof.

j. Whether or not any draft, copy, or reproduction of such document contains any script, notation, change, addendum, or the like, not appearing on such document itself, and if so, the answer shall give the description and identification of each such draft, copy or reproduction in accordance with the above subparts (a) through (i).

4. The above information shall be given in sufficient detail to enable any person or party to whom a subpoena or request for production is directed to identify the documents sought to be produced and to enable counsel to determine whether such document, when produced, is in fact the document so described and identified.

5. Notwithstanding any other instruction in this First Set of Interrogatories that is or may be to the contrary, if a document has already been produced by you to the Debtor/Plaintiff, such document may be identified by specifying the Bates numbers for all pages of such document.

6. A request that you identify a document is not limited to documents within your possession, and such requests shall extend to all documents under your control.

7. When an interrogatory asks you to "identify" a person, the answer shall contain the following information with respect to each such person:

a. The full name, current or last known business and residence addresses, and business and residence phone numbers of such person;

b. The name and address of the agency, employer or entity at which such person worked and/or to which such person reported;

c. The title(s) and related periods of service for such person with each such agency, employer or entity.

8. When an interrogatory calls for the "description" or "identity" of any "document" you contend to be subject to a privilege against disclosure in response to these interrogatories, provide with respect to each such document or communication the following:

a. The nature of the document you contend is privileged (*e.g.*, letter, memorandum, chart, picture, report, etc.);

b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.* Bates numbers) if any, on the document;

c. The date of the document which you contend is privileged;

d. The name(s) of the author(s) and of any recipient(s) of the document;

e. The name and address of any person who is not included in your response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document that you contend to be privileged; and

f. The nature of the privilege asserted.

9. In answering each of these interrogatories, furnish all information available to you that is relevant or that might lead to the discovery of relevant evidence, including information in the possession of your attorneys, or their investigators, and all persons acting on your behalf, including but not limited to your employees, agents, officers, or representatives. If you are unable to answer these interrogatories in full after exercising due diligence to supply a complete answer, so state and answer to the extent possible. Specify the reasons for your inability to answer and state whatever information or knowledge you have concerning the unanswered portions.

10. For each interrogatory or part of an interrogatory that you refuse to answer on grounds of burdensomeness, explain in as much detail as possible the basis for your refusal.

11. These interrogatories are deemed to be continuing; as such, you are requested to file and serve by way of supplemental answers thereto such additional information as may be required to complete your answers to these interrogatories.

## INTERROGATORIES

Where applicable, with respect to your answer to each of these interrogatories, please:

A. identify each person on whose testimony you will or may rely in support of your answer;

B. identify each document on which you will or may rely in support of your answer.

    1. State the name, job title and business address of each person providing information in response to these discovery requests:

1

2. State the type of business organization BANK OF NEW YORK MELLON,
f/k/aBANK OF NEW YORK is, and name each State of the Union in which BANK
OF NEW YORK MELLON, f/k/a BANK OF NEW YORK is chartered or
registered:

2

3

4

5

6

7

8

9

10

11

12

13

3. State the name, job title, and business address of each person who has first-hand
personal knowledge of the time and circumstances under which the promissory note
obligating Andrew C. Bailey and/or alienable in this instant case was created, sold,
transferred and/or assigned for value:

14

15

16

17

18

19

20

21

22

23

24

25

4. State the name and contact information of the creditor in the instant case.
(NOTE: The creditor is the person who actually provided the money for the Debtor's loan in expectation of payment, and who stands to lose money in the event of default.)

5. State the names and contact information of all persons or entities, in order of assignment, who at any time were constructive holders or holders in due course of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

6. State the name and contact information of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7. If the name of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case in Item (6) above is different from your name BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK explain why:

8. BAC HOME LOANS SERVICING LP has filed with the Bankruptcy Court a Proof of Claim with respect to the subject promissory note. Explain the nature of BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK's relationship with BAC HOME LOANS SERVICING LP in this instant case. If none, state "none".

9. Explain why the alleged copy of the promissory note submitted as Exhibit "A" attached to BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK's Motion for Lift from Stay includes no allonge or endorsement showing any assignment of the note to BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK:

1

2    10. If BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK did not

3    keep or cannot produce a copy of an allonge or other paper showing assignment to
BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK of the

4    promissory note obligating Andrew C. Bailey and/or alienable in this instant case,
explain why:

5

6

7

8

9

10

11    11. Identify the name, address and telephone number of each person or entity likely

12    to have discoverable information relevant to the foregoing or that you may use to
support your action.

13

14

15

16

17

18

19

20

21

22

23

24

25

## REQUEST FOR PRODUCTION OF DOCUMENTS

Debtor/Plaintiff hereby requests that Movant/Defendant BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK produce the following documents for inspection and copying within 30 days of service of this request, or any earlier date on which the parties agree, subject to the foregoing Definitions and Instructions set forth above, at the offices of the Yavapai County Recorder, 6th Street, Cottonwood, AZ or at another location agreeable to the parties hereto.

1. Produce the <u>original</u> promissory note signed by Andrew C. Bailey and/or alienable in this instant case. If none, state "none."

2. Produce all documents identified by you in response to each interrogatory set forth above. If none, state "none".

3. Produce all documents associated with BAC HOME LOANS SERVICING LP's authorization of BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK's right to enforce the promissory note obligating Andrew C. Bailey and/or alienable in this instant case. If none, state "none".

4. Produce a copy of the allonge or endorsement attached to the promissory note obligating Andrew C. Bailey and/or alienable in this instant case showing an assignment of the promissory note from MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC to BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK. If none, state "none."

5. Produce any and all Pooling and Servicing Agreement or other contractual agreement or

6. Produce the account and general ledger statement of each transaction BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK alleges Andrew C. Bailey has made with BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK with respect to the promissory note alienable in this instant case, showing all receipts and disbursements. If none, state "none".

7. Produce all bills of sale and allonges and agreements illustrating where the promissory note alienable in this instant case was sold or assigned for value, from inception to the present. If none, state "none".

8. Produce all insurance claim information and credit default claim or settlement or payment records relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

9. Produce all information pertaining to Federal TARP or other bailout settlements or payments relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

10. Produce all contracts, agreements, and/or memos illustrating that law firm Gust Rosenfeld, PLC has authority to represent BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK in this instant case. If none, state "none".

11. Produce all assignments, contracts, agreements, and/or memos identifying both the creditor and the current beneficiary in this instant case. If none, state "none".

12. Produce all contracts, agreements, and/or memos illustrating that BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK or its attorney law firm Gust Rosenfeld, PLC has authority to represent the creditor and/or the current beneficiary in this instant case. If none, state "none".

13. Produce all contracts, agreements, and/or memos illustrating that BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK has authority to represent CWALT, Inc., Alternative Loan Trust 007-HY4 Mortgage Pass-Through Certificates, Series 2007-HY4, its assignees and/or successors in interest in this instant case. If none, state "none".

14. Produce all contracts, agreements, and/or memos illustrating that BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK has authority to represent the bondholders or certificateholders of CWALT, Inc., Alternative Loan Trust 007-HY4 Mortgage Pass-Through Certificates, Series 2007-HY4, its assignees and/or successors in interest in this instant case. If none, state "none".

15. Produce all documents or data compilations that are in your possession, custody or control that you may use in support of your action.

Respectfully submitted this 19th day of January, 2010
(Previously submitted in the administrative case on the 11th day of January, 2010)

Signed _____
Andrew C. Bailey, *Plaintiff and Debtor in Pro Per*

**CERTIFICATE OF SERVICE**

I, Andrew C. Bailey, certify that on the 11th day of January, 2010, a true and correct copy of Debtor's First Set of Interrogatories and First Request for Production of Documents was served upon the attorney for Movant by both certified mail and facsimile transmission to:

Gerard R. O'Meara, Esq,

Bar # 002434

Gust Rosenfeld, PLC

1 South Church Avenue, Suite 1900

Tucson, AZ 85701-1620

(Attorney for BANK OF NEW YORK MELLON, f/k/a BANK OF NEW YORK)

Signed this 11th day of January, 2010.

Andrew C. Bailey, *Debtor in Pro Per*