**FILED**

JAN 2 2 2010

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

49

1  **ANDREW C. BAILEY**
2  2500 N. Page Springs Rd
   Cornville, AZ 86325
3  928 634-4335
   *Self-Represented Litigant*
4

5          IN THE UNITED STATES BANKRUPTCY COURT

6              FOR THE DISTRICT OF ARIZONA

7

8  | In Re: | **Chapter 11** |
   | ANDREW C. BAILEY, | **Case #: 2:09-bk-06979-PHX-RTBP** |
9  | **Debtor** | |

10 | | **DECLARATION IN SUPPORT OF** |
   | ANDREW C. BAILEY, | **DEBTOR'S OPPOSITION TO MOTION** |
11 | Respondent | **FOR STAY RELIEF** |
   | | **(INCLUDING EXPERT WITNESS** |
12 | vs | **DECLARATION)** |

13 | WELLS FARGO BANK NA | |
14 | Movant | Subject property: |
   | | 2500 N. Page Springs Rd, |
15 | | Cornville, AZ 86325 |

16 | | Wells Fargo Account #: 0152325825 |

17

18          **DECLARATION IN SUPPORT OF DEBTOR'S**
            **OPPOSITION TO MOTION FOR STAY RELIEF**
19          **(INCLUDING EXPERT WITNESS DECLARATION)**

20 I, Andrew C. Bailey, am the Debtor and Respondent in the above-captioned matter and

21
   declare and state as follows:
22

23

24 1. The grounds for my opposition are based on months of intensive research, forensic

25 analysis, and consultation with mortgage, banking industry and securitization experts.

2. In my opposition to the instant action, I am raising a fundamental issue of fact. I have been informed by expert industry analysts that Movant is not my creditor. I have an expert witness who will testify to this at an evidentiary hearing.

3. I am therefore requesting an evidentiary hearing based on the rules of evidence and founded on common discovery and enforcement in obtaining relevant information about my loan.

4. I am seeking the identity of my creditor and a full accounting of the subject Transaction, to wit, the identity(ies) of the creditor(s) who actually funded the subject loan, and the production of documents and names, addresses and phone numbers of people who can testify under oath at an evidentiary hearing.

5. I have secured the services of a mortgage audit firm, which has performed a forensic review of the Transaction. However, Movant and Movant's partners in the securitization scheme are the sole party(ies) in possession of undisclosed information, making it impossible for an outside party to determine the facts.

6. I have secured the services of an expert in securitized residential mortgage products and mortgage-backed securities to appear at an evidentiary hearing as my expert witness. Exhibit "A" (Resume of Expert Witness)

7. The expert witness has executed a Declaration of his findings, opinions and recommendations. Exhibit "B" (Declaration of Expert Witness)

8. On September 21, 2009 I served on Movant a Qualified Written Request pursuant to the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 and a Debt Validation Letter pursuant to the Fair Debt Collection Practices Act 15 U.S.C §1692 in a diligent attempt to clarify the above issues. I received no 20-day acknowledgement of the request. Within the 60-day response period I received a purported response package from Movant which however contained nothing more than my payment history and a photocopy of the original Note. This response falls woefully short of full compliance with the relevant statutes and completely fails to provide the requested information.

9. As a result of Movant's non-compliance with the above Federal statutes, I have had no alternative but to initiate adversary proceeding 2:09–ap–01731–RTBP. I served my First Set of Interrogatories and First Request to Produce Documents on Movant on January 11, 2010 as set forth in Exhibit "C". Response is required within 30 days.

10. As my expert witness will illustrate, Movant has failed to prove that it is the holder of all rights under the Note, which would permit the legal holder thereof to declare a default, which would trigger a foreclosure.

11. Movant has not demonstrated that it has suffered an actual or threatened injury as a consequence of any default, which distinct and palpable injury is legally required under applicable Federal and State law in order for Movant to satisfy the legal prerequisite to prove that it has a sufficient personal stake in and legal standing to institute a foreclosure on the Property.

12. As a severance of the ownership and possession of the Note and Mortgage has occurred and as the true owner and holder of both the Note and Mortgage are unknown as a result of one or more assignments and the parsed sale of certain rights under the Note to at least one third party, specifically Lehman Brothers Bank, FSB, Movant is legally precluded from foreclosing on the Property unless and until it can demonstrate full legal standing to do so. (Exhibit "D" Assignment to Lehman Brothers)

13. I am asking that the court impose a temporary restraining order enjoining Movant from taking any further foreclosure or other action before the resolution of the foregoing, thereby maintaining the status quo until discovery has been conducted.

15. Formal discovery in the adversary action may be the only way to determine the facts. I have consistently endeavored to avoid expensive and time-consuming litigation by invoking the RESPA and the FDCPA and their federally-mandated disclosure requirements, to no avail. I am asking the Court to enforce the requirements of the statutes.

17. Notwithstanding the above, it is also probable that the obligation was paid off by credit-default insurance (or Federal bailout) triggered by a Notice of (alleged) Default on the Transaction, or by a threshold percentage of defaults in a portfolio or trust of securitized loans of which my loan was part. This vital information is included in the disclosures requested under the RESPA and the FDCPA. This information continues to be withheld by Movant, in violation of Federal and State law and to the detriment of myself and my legitimate creditors.

18. Despite representations of Movant's counsel to the contrary, the matter of whether or not I have equity in the property remains unknown and unknowable until the above disclosures are made. If the obligation under the note was paid off at or before the alleged closing, or was subsequently paid off in any of a number of ways including but not limited to federal bailout or credit default insurance, I may have nothing but equity in the property.

19. The subject property is an essential element in my reorganization plan and the future development of my Retreat Center business. It is one of the two contiguous homes used to house facilitators, attendees and other guests and clients.

20. I believe I have excellent prospects for an effective reorganization once my creditor disputes have been resolved and I can resume promotional activities with respect to my businesses. I am presently negotiating a contract for regular monthly use of the Center, which should provide a solid basis for future success.

Dated January 20th, 2010

**Andrew C. Bailey, Debtor in Pro Per**

**Certificate of Notice**

Copy of the foregoing was
mailed on January 21, 2010 to:

Office of the US Trustee
230 N. First Avenue, Suite 204,
Phoenix, AZ 85003

Trustee

Leonard McDonald, Esq
Tiffany & Bosco, PA
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016
(Attorney for Wells Fargo Bank NA)

Dean Prober, Esq
Polk, Prober & Raphael
PO Box 4365
Woodland Hills, CA 91365-4365
(Attorney for BAC Home Loans Servicing, LP)

Ronald Horwitz, Esq
Jaberg & Wilk, PC
3200 N. Central Avenue, suite 2000
Phoenix AZ 85012
(Attorney for Wells Fargo Bank NA)

Gerald O'Meara, Esq.
Gust Rosenfeld PC
1 South Church Avenue, suite 1900
Tucson, AZ 85701-1620
(Attorney for Bank of New York Mellon)

# RESUME

## *NEIL F. GARFIELD*

*4980 S Alma School Rd A-2*
*480-895-5443 Fax: 772-594-6244*
*email: Ngarfield@msn.com*

## SUMMARY:

Varied and integrated professional and business background in the following areas — *investment banking, derivative security baskets, electronic funds transfer, management, information systems, accounting, auditing and law.*

- ✓ Currently teaching lawyers, judges, legislators, and layman in the Garfield Continuum Seminars for Attorney CLE credit and general information, appearing on numerous radio and TV broadcasts, Garfield is the Editor in Chief of livinglies.wordpress.com, a blog site that has reached over 1 million visits and is widely regarded as the premier resource on the internet for foreclosure cases, opinion, links to law reviews, practice guides and current events the foreclosure of securitized mortgages. Garfield draws on his Wall Street experience and trial lawyer years combined with intensive analysis of derivatives, securitized financial products and personal relationships developed over the years which give him unique insights into the realities of Wall Street in the Mortgage Meltdown of 2001-2009.

- ✓ Starting out on **Wall Street**, he became proficient in the language and conduct of highly complex financial transactions. At an early age, Mr. Garfield personally handled the negotiations leading to successful **mergers, acquisitions, multimillion dollar financing, IPO's, secondary offerings, and private financing** for dozens of companies.

- ✓ He then achieved his **MBA and JD degrees with distinction,** and began a 35 year law and business consulting career.

- ✓ Following his law career he assumed control of two **public companies** for which he successfully structured financing and merger programs, **creating and implementing novel business and marketing plans for information systems** storage and retrieval including a mobile platform for backfile conversion for clients who were installing imaging systems. Initial clientele included **Fannie Mae, Chemical Bank, the Securities and Exchange Commission, the New Mexico Legislature,** and a host of Universities and Government agencies. Under his direction the publicly traded stock increased market value from **$150,000 to $45,000,000** in nine months.

- ✓ Following that engagement, he bought out the **ATM/POB portfolios** of several different companies now consolidated under EFT Systems, Inc., d/b/a American Bank Card, which now manages more than **$30 million** in electronic payments for retail sales, an **increase of 250%.** The EFT's **business expanded** to include **prepaid debit cards, ACH origination, and technology consulting** to banks and independent sales organizations.

- ✓ As president of American Bank Card, he created, funded and implemented the business plan for a cooperative marketing channel to community banks for technology sales, deployment, and support. He is now **General Counsel to the SMART cooperative of community banks** that includes a newly launched bank network, and a host of electronic funds transfer services on behalf of bank and private enterprise clients.

Exhibit A

**WALL STREET BACKGROUND:**

With a family securities business in his background (Garfield and Co. Members NYSE, AMEX etc.) Mr. Garfield started off as a trainee securities analyst and quickly rose to be Director of Research and Director of Mergers and Acquisitions at well-respected brokerage houses on Wall Street. At the end of this portion of his career, Mr. Garfield concurrently studied for his **MBA *magna cum laude*.** He was licensed as a registered representative 1968-1972.

**LAW CAREER**

Following his investment banking career, Mr. Garfield moved to Florida where he studied law and was awarded his **JD degree *cum laude*.** Concurrently with his studies, he was the business manager for a small law firm in Fort Lauderdale.

A member of the **Florida Bar** since 1977, he devoted most of his time to practicing law from 1977 through 1992. He is also a member of the **Federal Trial Bar**, the Federal Bankruptcy Bar, and several national and local committees. Until his semi-retirement in December, 1992 he was also a member of The Florida Trial Lawyers Association, the American Bar Association and the West Broward Bar Association. He has served on committees for the Florida Bar and was a volunteer, early in his legal career for the Florida Bar Committee for mental disability law reform, where he represented individuals incarcerated for reasons associated with mental disabilities (pro bono).

He received his Undergraduate Degree from Dickinson College in 1968, his MBA from Iona College in 1974, Magna Cum Laude, and his Juris Doctor from Nova University Center for the Study of Law in 1977, Cum Laude.

The concentration of his law practice was in the areas of commercial transactions, commercial litigation, condominium law, administrative law and bankruptcy. He has been the recipient of **numerous academic awards** in business and law, including:

**LAW**
*American Jurisprudence Award in Torts
*American Jurisprudence Award in Commercial Transactions
*American Jurisprudence Award in Federal Jurisdiction
*Horn Book Award for outstanding scholastic achievement from Nova University Law Center (first out of 175 students)
**BUSINESS, ACCOUNTING AND TAXATION**
*Medal for Academic Excellence 1974, MBA, (first in a two-year program of 159 students)
*Who's Who Among Students in American Universities and Colleges - 1974 - Iona College

Concurrently with his law career, he was frequently retained as a **business consultant** to small and medium sized businesses. Mr. Garfield assumed the Presidency of two public companies in 1992 and was charged with the responsibility of finding and closing on mergers, acquisitions, financing, and developing the business plans of those entities through the acquisition of qualified personnel. At the commencement of his engagement, neither company had any assets other than loosely defined business plans. In an 18 month period these companies **raised over $2.5 million in cash, made acquisitions for real estate valued in excess of $8 million,** and acquired several operating companies. In addition, the business plans of the companies were refined, placing DIS as the leading company in the field of backfile conversion (conversion of hard copy documents into computer storage) and consulting on information systems, storage and retrieval. During that tenure he managed 45 employees.

## PUBLICATIONS

Published numerous **articles on law and business, including practice manuals for Florida lawyers.** He has published several articles and tapes on specific legal and business subjects as well as personal development and has appeared on numerous television and radio programs, including the Sandy Peyton Show, Eyewitness News, Palm Beach, Florida, PBS and Channel 33, WNWS Radio, WJNO Radio, and had his own radio talk show on WGBS in 1986.

Editor of *SMARTBanking Fax Newsletter,*, to 350 Florida independent community banks. Currently working on articles for banking publications and other publications and a book intended to be published in early 1999 entitled *Banking in the Next Millenium: Strategies for Survival and Prosperity.*

## EMPLOYMENT HISTORY:

2007—present Founder and Editor www.livinglies.wordpress.com

2008-present presenter of **Garfield Continuum Attorney CLE and Lay Seminars in Foreclosure and Securitized Mortgages**

2003—present: **Consultant to General Transfer Corporation, GTC Consulting**

1997—2009 General Counsel SMARTBanks

1997—present: **Chairman, President EFT Systems, Inc. d/b/a American Bank Card**

1994-1999 **Editor of SMARTBanks Fax Newsletter**

1994: **Chief Operating Officer, American Bank Card, Inc.**

1992 - 1994: Chairman and CEO Technology International, LTD., Chairman and CEO, Data Imaging Services, Inc., Chairman, Garco Business Development Corp. .

1992 - 1993: Partner, Garfield & Levin, P.A., condominium law.

1978 - 1992: President, Garfield & Associates, P.A., general law practice.

1977 - 1978: Partner, Law Offices of Fields & Garfield, general practice.

1977 Partner, Law Offices of Hurth, Fields & Garfield, general practice.

1975 - 1977: Business Manager, Law Offices of Hurth & Saphirstein

1973 - 1975: Consultant, Garfield & Company - Members, NYSE, AMEX, etc.

1970 - 1973: President and Majority Shareholder, Leisure Research Company, Investment Bankers

1969 - 1970: Director, Mergers and Acquisitions, and Registered Representative, Granger & Company, Members NYSE, AMEX, etc.

1968 - 1969: Director Research Department, and Registered Representative, Spingarn, Heine Company, Members, NYSE, AMEX, etc.

1968 Trainee - Security Analyst and Registered Representative, A.L. Stamm & Company, Members, NYSE, AMEX, etc.

## TEACHING AND PUBLIC SPEAKING EXPERIENCE:

1. Iona College **Graduate School** of Business Administration: Taught individual classes in a variety of management, auditing and accounting courses as substitute for usual professor.

2. Broward Community **College**: Taught variety of subject dealing with law and business for adult education. Guest lecturer on business, law, and psychology of learning and performance.

3. **Seminars**: Conducted numerous seminars in law, business and personal development. Methods employed: lecture, Socratic and experiential. Garfield Continuum Seminars on Foreclosure Defense, Litigation and Securitized Mortgages is qualified for Continuing Legal Education Credits in 26 states varying from 6.5 to 9.5 credits.

4. **Trials**: Every trial is an educational seminar for the jury or judge. In the course of 17 years of practice, has appeared as lead counsel in over 2000 contested hearings, bench trials and jury trials and approximately 20 oral arguments on appeal.

5. **Radio**: In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television**: Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

## PERSONAL:

Married December 6, 2003 to Joyce Molloy Children: Marc Andrew Garfield DPM (40, prior marriage, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (35, prior marriage, Director of Website for Citizens property Insurance, Florida, Danielle Kinorah Garfield, age 20, attending Broward Community College, Cocnut Creek, FloridaAmerican Heritage School in Plantation, Florida. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C.. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world.

**ANDREW C. BAILEY**
2500 N. Page Springs Rd

Cornville, AZ 86325

928 634-4335

*Debtor in Pro Per*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andrew C. Bailey<br><br>    Debtor  _____ | **Chapter 11** |
| <br>vs.<br><br>WELLS FARGO BANK, NA.<br>LEHMAN BROTHERS BANK<br>ET AL | **Case# 2:09-bk-06979-PHX-RTBP**<br><br>**DECLARATION OF NEIL FRANKLIN GARFIELD AS EXPERT WITNESS**<br><br>Subject property:<br>2500 N. Page Springs Road,<br>Cornville, AZ 86325<br><br>Subject transaction:<br>Wells Fargo # 0152325825 |

STATE OF ARIZONA     )
                                )   **ss.**
County of Maricopa      )

Neil Franklin Garfield, deposes and states unsworn under penalty of perjury as follows:

1.     I am over the age of eighteen years and qualified to make this affidavit.

2.     I have been a licensed member in good standing of the Florida Bar FBN 229318

1

*Exhibit B*

since May 31, 1977

3.      I am the author and editor of www.livinglies.wordpress.com a blog site on the
Internet which contains most of the public records and public domain reports,
articles, books, treatises and documentation upon which I rely for my opinion in this
case. I am the author of the manuals and workbooks that are used to accompany
the workshops and seminars that present under the name GARFIELD
CONTINUUM. Those manuals are the nearest thing available in the marketplace to
treatises involving foreclosure of securitized residential mortgages. In addition I have
an indirect interest in Foreclosure Defense Group that performs forensic analysis of
loan documents, title examinations, analysis of securitization documentation, and
prepares Qualified Written Requests, Debt Validation Letters and demand letters for
clients, most of whom are attorneys licensed in the jurisdiction in which the subject
property is located. Foreclosure Defense Group sponsors the Garfield Continuum
Seminars in which I teach laymen and lawyers to understand civil procedure,
evidence, motion practice, discovery, ethics, securitization theory and practice,
defensive and offensive strategies with servicers, MERS, Trustees, mortgage
brokers, "originating lenders," investment bank underwriters, special purpose
vehicles and bond issuance. Subjects also include elements of property law,
contract law, negotiable instruments, Uniform Commercial Code, tort law and
consumer protection under Federal and State enabling legislation.

4.      I have recently testified at deposition as an expert in the class action suit in Case

2

No.: 3:09-cv-180-ECR-VPC, United States District Court District of Nevada,[1] to render opinions in the topic areas related to the securitization of mortgage loans, derivative securities, the securities industry; real property law, Uniform Commercial Code practices, predatory lending practices, Truth in Lending Act requirements, loan origination and underwriting, accounting in the context of securitization and REMIC entities, Special Purpose Vehicles, Structured Investment Vehicles, pooling and servicing of securitized loans, assignment and assumption of securitized residential mortgage loans, creation of trusts under deeds of trust, pooling agreements, and issuance of asset backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities, the economics of securitized residential mortgages during the period of 2001-2008, appraisal fraud and its effect on APR disclosure, usury, exceeding the legal limit for interest charged, non-judicial foreclosure of securitized and non-securitized residential mortgages, and judicial foreclosure of securitized and non-securitized residential mortgages, all particularly as to the laws of the State of Arizona, California, Florida and Ohio, based upon the

---

[1] JOSEFA S. LOPEZ, JOSE TRINIDAD CASAS, MARIA C. CASAS, LYNDON B.GRAVES, TYRONE EVENSON, MICHELLINA EVENSON, BRYAN GRAY, HELEN GRAY, PATRICK FRANKOSKI, and CHRISTOPHER PETERNELL, individually and on behalf of a class of similarly situated individuals, Plaintiffs vs. EXECUTIVE TRUSTEE SERVICES, LLC.; COUNTRYWIDE HOME LOANS, INC., a New York corporation; MERSCORP, INC., a Virginia corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a subsidiary of MERSCORP, Inc., a Delaware corporation; RECONTRUST, SAXON MORTGAGE SERVICES, INC., GALE GROUP dba T.D. FINANCIAL SERVICES dba T.D. SERVICE COMPANY, SECURITY UNION TITLE INSURANCE COMPANY, CAPITAL ONE dba CHEVY CHASE BANK, NATIONAL DEFAULT SERVICING CORPORATION, FEDERAL HOME LOAN MORTGAGE CORPORATION, a Virginia corporation; FEDERAL NATIONAL MORTGAGE ASSOCIATION, a District of Columbia corporation; GMAC MORTGAGE, L.L.C., a Delaware corporation; NATIONAL CITY MORTGAGE, a foreign company and a division of NATIONAL CITY BANK, a subsidiary of National City Corporation; NATIONAL CITY CORPORATION, a Delaware corporation and a subsidiary of PNC Financial Services, Inc.; PNC FINANCIAL SERVICES, INC., a Pennsylvania corporation; J.P. MORGAN CHASE BANK, N.A., a New York corporation; CITIMORTGAGE, INC., a New York corporation; HSBC MORTGAGE CORPORATION, U.S.A., a Delaware corporation; AIG UNITED GUARANTY CORPORATION, a foreign corporation; WELLS FARGO BANK, N.A., a California corporation, d/b/a WELLS FARGO HOME EQUITY and d/b/a WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., a California corporation; BANK OF AMERICA, N.A., a Delaware corporation, and GE MONEY BANK, an Ohio corporation; JOHN AND JANE

credentials in the Resume attached hereto.

5.    I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. The cost of my preparation, analysis, review, meetings, teleconferences, appearances and all other work is $500 per hour plus all out of pocket expenses all of which must be prepaid regardless of outcome.

6.    With respect to **Case #: 2:09-bk-06979-PHX-RTBP and related matters in administrative and judicial proceedings** I have received and reviewed some of the pleadings and memorandums, some of the orders entered, conferred with the forensic analyst that reviewed the purported loan closings on the subject properties, the closing loan documents and additional pleadings relating to the subject "loan" transactions. I have confirmed the information related to me through my review of said closing documentation, as well as my own internet searches with respect to the parties purporting to be the "Lender" (see end-note 1) in the transaction subject to the instant matters.

7.    My opinions are based upon public records and documentation written or prepared by the purported originating parties that are named or designated as a "lender"[i] or "beneficiary" or "Payee" or "trustee" in the contracts and deed executed by the homeowner in this case, as well as the documentation that in my opinion was relevant to the securitization of the financial product sold to the homeowner as a residential home loan and simultaneously or contemporaneously sold as a financial

DOES I-X;  BLACK AND WHITE PARTNERSHIP I-X.

4

product to an investor. In my opinion, both financial products (i.e., the transaction with the property owner and the transaction with the creditor/investor who purchased mortgage-backed bonds from an entity that was not disclosed at closing to the property owner) were securities, and neither set of securities were properly registered or regulated. The information that would reveal the identity(ies) of the creditor(s) has been withheld from Debtor. It can only be said, in the context of an absence of answers to the qualified written requests that the creditor can be described but not identified. The initiating parties in foreclosure are not creditors and do not appear to have ever advanced money, goods or services, nor did they enter into any arrangement wherein they expected payment to be due to them. Rather, as is apparent from the information at hand, the payment was, as is always the case, due to the creditor who advanced the money or his/her/its successor. The parties have assumed the identity of "beneficiary", "lender" and/or "payee" despite the fact that the loan was securitized which means that it was sold to investors who were the source of the advance of funds. Since the sale of bonds to the investor is customarily a transaction that precedes the sale of the financial product sold to the property owner, it is my opinion that it may be fairly and reasonably assumed that at the time the documents were executed, the creditor was the bond holder, contrary to the nominal designations on the closing documents.

8.     The customary practice in securitization of residential mortgage loan products was to withhold information concerning the identity of the creditor and to withheld the disclosure of profits and fees made on the multiple yield spreads and premiums paid

5

thereon, amounting in this case to a substantial portion of the total principal of the loans themselves, using average data from the marketplace congruent with the time and place of these transactions. The actual information that would provide the identity of the creditor and thus allow inquiry for a complete accounting and audit of the subject transactions is in the sole care, custody and control of the loan servicer or another intermediary conduit in the securitization chain, including but not limited to the Trustee or depositor for the Special Purpose Vehicle that re-issued the homeowner's note and encumbrance as a derivative hybrid debt instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

8.1.   According to information from Debtor, Debtor has made unsuccessful attempts through industry standard letters requesting the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

8.2.   At such time that the intermediary participants in the securitization comply with the requests for said information, I will be able to identify with certainty the true owner of the alleged obligation, thus enabling me to provide the court with a complete description of the entire transaction starting with the creditor and ending with the debtor and any co-obligors or other conditions added during the process of securitization of the loan product sold to the property owner. In such event the identity of the creditor(s) and the opportunity to obtain a full accounting

6

will be present. Until then, I am dealing with only partial information in that there are four parts to the required accounting:

8.2.1.  The debits and credits arising from the moment of the closing of the subject transactions

8.2.2.  The debits and credits arising from transactions between the property owner and each servicer

8.2.3.  The debits and credits arising from transactions with third parties either during or after the first phase of securitization was completed

8.2.4.  The debits and credits arising from transactions in which insurance proceeds or other third party proceeds were received and distributed including the Federal Reserve, Federal Agencies, the U.S. Department of the Treasury, The FDIC and other unknown and therefore unnamed parties.

8.3.    Until such time as the full accounting is available and subject to audit, it is impossible to know the amount due from the property owner on the obligation that might have been created at the alleged closing of the subject transactions.

8.4.    Without knowing the amount due on the obligation it is therefore impossible to determine whether a default exists, and if so, who is suffering financial loss as a result of the default.

8.5.    Until such time that the identity is revealed by Defendants, I must rely upon internet searches making certain presumptions regarding the subject loan transactions. The main presumptions are that the standards of the industry were followed in the securitization of the subject transaction and that the subject

7

transactions were in fact securitized. I arrive at those conclusions both from information appearing in the record and from my knowledge that where these particular parties are involved, the probability of securitization is nearly 100%. The prospectus that was filed with the SEC apparently covering the parties and time period consistent with the Bailey "Loan" Transaction reveals explicit terms and conditions upon which I base my opinions.

8.6.　　In my opinion the party identified as "LENDER" "originated" loans acting as a mortgage broker and not as a mortgage lender. The real lender was the source of funds advanced for the funding of the loan. I rely upon common definitions of creditor, debtor, lender etc. found in bankers' glossaries, law dictionaries, and through my practical experience and training in securities analysis, underwriting, my training in law school, my training in business school and my experience on Wall Street, and as a practicing lawyer in commercial transactions and commercial litigation.

8.7.　　Answers are required either in response to the qualified written request or through discovery. Confirmation of my opinions would include but not be limited to the manner in which each firm in the securitization reflected the transaction on its own financial records. In most cases it appears merely as fee income or profit on sale which would confirm that the party never was a creditor.

8.8.　　It appears as though all originated loans were subject to previously existing agreements including Pooling and Service Agreements and Assignment and Assumption Agreement, in which the originated loans were already pledged

8

or conveyed to third parties (investors/creditors/LENDERS) at the time of Plaintiff's "closing."

8.9.     At each level of securitization a successor "Trustee" was named purporting to acquire all powers of the "Trustee" before the loan was transmitted, transferred, sold or hypothecated to another party. In each case there does not appear to actually be a "Trust" as the beneficiaries of each "Trust" are either ambiguous or not present at all.

8.10.     In each case the nominal "Trust" actually contained no assets, the same having been transferred to yet another entity PRIOR to the existence of the subject transaction.

8.11.     In the case of the entity that issued bonds to the creditors as mortgage backed securities, in each case the mortgages to back those securities did not yet exist. In each case, though, the body of the bond indenture explicitly conveys a percentage interest in the "pool" to the creditor forming what appears to be a general partnership, with the indenture in reality being a partnership or operating agreement.

8.12.     In each case, the "Trustee" is named but then described and its powers circumscribed increasingly as one reads through the enabling document, such that it appears that the party named as "Trustee" is in actuality an agent with very limited powers.

8.13.     In many cases and in particular with the parties involved in this litigation, they were the recipients of proceeds from the Federal Reserve that "purchased"

9

the mortgage backed securities, thus making the Federal Reserve the creditor in whole or in part in these subject transactions.

8.14.    Typically all such indentures create a hybrid security that is both bond and equity, to wit: the bond provides for a stated interest rate of return and provides ownership of a percentage of a pool of assets comprised of residential loans, which would most certainly have included the subject loan.

8.15.    In many cases the "trusts" were disbanded and no longer exist as legal entities. Without further disclosure from these parties, it is impossible to know whether the vehicles used for processing the creditor's investment in mortgage loans still exists and if so, its status.

8.16.    In most cases there have been multiple assignments or transmittals of documents or rights with regard to multiple parts of the securitization chain. These various stakes or revenue streams could include but not be limited to servicing rights, foreclosure rights, collection on the note, collection of federal bailout grants or loans, collection of payments from co-obligors added during the securitization of the Debtor's note, and collection of payments on credit default swaps which frequently are leveraged as much as thirty times the original value of the note(s) in the pool of assets subject to the CDS. Thus it is not known by the servicer or originator whether the Plaintiff/Debtor's note is or ever was in default – a fact that can only be known by the creditor and which is either not known or being withheld by the securitization parties in the case at bar. Based upon published reports, in my opinion, there is a very high probability that all or

10

part of the Debtor's note was paid in whole or in part by third parties, that different parties came to claim rights to enforce the mortgage and note and that the intention to split the note from the mortgage while heretofore unusual in the marketplace was commonplace in securitization of residential loans. Hence, it is my opinion that the holder of the note, either singular or plural, are not the same parties as those who purportedly hold the mortgage and that this was a result that was intended by the mortgage originator and the parties to the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

8.17.     The above facts result in a conflict of interest, claims and stakes by numerous parties contained within the securitization chain, some of which parties are known and some of which not known to Plaintiff/Debtor and therefore not known to the undersigned declarant.

8.17.1.     It also appears that the standard industry practice of creating a yield spread premium between the lender and originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, the Plaintiff/Debtor's loan was sold to the investors at a gross profit (i.e. a second yield spread premium) to the participants in the securitization chain of at least 35% of the total principal balance of the note. In my opinion, this disclosure does not appear on any of the closing documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real

11

Estate Settlement Procedures Act. Further, no information appears in Plaintiff/Debtor's closing documentation that would have caused him to inquire about such a premium, which exceeds any yield spread premium ever paid prior to the securitization of residential mortgages. In my opinion, it is equally probable that the investors were kept unaware that less than 2/3 of their investment was actually going to fund Plaintiff/Debtor's loan and other similarly situated. Based upon direct conversation with Plaintiff/Debtor, he also was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

8.18.    Additional information submitted by licensed appraisers still in good standing with the licensing board along with public records documentation in other states indicates a pattern of behavior consistent with the subject "loan" Transaction, corroborates the existence of the second yield spread premium and shows that the appraisal on the property, upon which the property owner reasonably and legally relies as per the requirements of law and regulation, was artificially inflated per direct instructions from the purported "lender" or other firms in the securitization chain ultimately receiving their instructions from the investment banking firm that did the underwriting of the securities sold to the creditors/investors and which issued the instructions regarding the underwriting of the purported loans to homeowners including the subject transaction.

9.    My opinions are also based upon substantial knowledge, training, experience,

12

study and analysis of securities, securities regulation, securitization, derivatives and various precursor asset protection or bankruptcy remote schemes in commercial and real estate settings.

10.     My opinions are also based upon direct interaction via telephone, email or written correspondence with many intermediary conduits and some underwriters of the reissued securities to investors who bought mortgage-backed securities.

10. My opinions are based upon certain assumptions regarding securitization of the subject loan which can only be verified by review and analysis of the actual securitization documents, applicable credit default swaps or other insurance or hedge products, and audit, review and analysis of the effect, if any, of federal bailout money received by the creditor, (i.e., the party who actually advanced the funds from which the subject obligation was funded) or any parties who received such funding or money relating to or arising from the subject homeowner obligation created by the financial loan product sold to the homeowner in this instance.

11.     I express the following opinions that are offered within a reasonable degree of factual certainty and financial probability based upon filings with the Securities and Exchange Commission, prior knowledge of intermediary/conduit parties in the subject transactions, and the known participants in this loan and its securitization:

11.1.     The subject real estate and securities transactions were securitized, to wit: The subject homeowner and the unidentified Lender(s)/investor(s) entered into a transaction which was represented as a loan transaction whereby the investor(s) lent money to the homeowner and other homeowners similarly situated.

13

11.2.     In terms of the real estate portion of the transaction, the homeowner was the borrower and the investor was the lender. The investor is still the lender if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable. Thus for purposes of this declaration, the unknown and undisclosed investor(s) constitute the only Lender presumed to exist until the undersigned is presented with contrary evidence admissible in a court of law.

11.3.     The only parties that can claim to be creditors (or a holder in due course of the note) are those who would suffer a monetary or pecuniary loss resulting from non-payment of the obligation either because they advanced the actual funds from which the Bailey Loan Product was funded or because they would have paid value prior to default or notice of default. These parties fall within one or more of the following classifications:

11.3.1.        Investors who purchased asset backed securities in which ownership of the LOANS was described with sufficient specificity as to at least express the intent to convey ownership of the obligation as evidenced by the promissory note and an interest in real property consisting of a security interest held by an entity that was described as the beneficiary of a Trust created by an instrument entitled Deed of Trust;

14

THEREFORE I CONCLUDE THAT THE CREDITORS ARE THE UNIDENTIFIED INVESTORS AND ALL OTHER PARTIES ARE INTERMEDIARY OR REPRESENTATIVE OR DISINTERESTED.

11.4. Title is affected by the following:

11.4.1. Insurers that paid some party on behalf of said investors;

11.4.2. counter-parties on credit default swaps;

11.4.3. conveyances or constructive trusts arising by operation of law through cross collateralization and over-collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches ("tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle);

11.4.4. the United States Treasury Department through the Troubled Assets Relief Program in which approximately $700 billion has been authorized and paid to purchase or pay the obligation on "troubled" (non-performing) assets of the LOANS. The subject "loan" is part of the class of assets targeted by TARP;

11.4.5. the United States Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets;

11.4.6. any other party that has traded in mortgage backed securities from the aggregated pools or securitized tranches containing interests in the LOANS.

15

12.     However, it is unlikely that any holder in due course exists because in the practice of securitization as it was followed universally within the investment banking community, the recorded encumbrance was never effectively or constructively transferred because it was never executed in recordable form nor was an effort made to create such a document by the parties to the instant case until they decided to issue a notice of delinquency, notice of default, notice of sale, and Petition for Unlawful Retainer and Writ of Possession.

12.1.     Hence any transfer or purported transfer of the note was not accompanied by the encumbrance being incident to said transfer because applicable recording statutes require an interest or change of interest in real property to be recorded. Hence the loan product sold to the subject homeowner included a promissory note that was evidence of a real obligation that arose when the transaction was funded but lost its negotiability, thus barring anyone from claiming holder in due course status.

12.1.1.     The negotiability of the note is negatively affected by (1) the splitting of the note and mortgage as described above, (2) by the addition of terms, conditions, third party obligors and undisclosed profits, fees, kickbacks all contrary to existing federal and state applicable statutes and common law and (3) knowledge of title and chain of title defects in the ownership of the note, beneficial interest in the encumbrance, and position as obligee on the obligation originally undertaken by the subject homeowner. .

16

12.2.    None of the known participants in the subject securitization chain (including but not limited to Defendants herein) falls within any of the classifications of "Lenders" or holders in due course on the subject financial products sold to the subject homeowner as LOANS. A Lender or Creditor is a party who advances or creates money for the benefit of another with the expectation of receiving it back, usually with a profit denominated as "interest." The investor fits this definition. All other parties including the putative foreclosing parties in the case at bar, fall into the class of intermediaries or conduits, playing the role of payment mechanism or document repository or record keeper.

12.3.    None of the known securitization participants has suffered any financial loss relating to the LOANS, nor are they threatened with any future loss if foreclosure remains enjoined by the automatic stay.

12.4.    None of the known securitization participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the LOANS.

12.5.    None of the known securitization participants will suffer any monetary loss through non-performance of the LOAN.

12.6.    All of the known securitization participants received fees and profits relating to the LOANS.

12.7.    The existence and identity of the real parties in interest was withheld from the homeowner in the closing and servicing of the LOANS, and since.

13.    Several transactions have purportedly taken place regarding the Bailey "Loan."

17

None of them appear to have actually conveyed anything since all conveyance documentation was effective simultaneously or contemporaneously with closing of the subject transactions. The investors are still the source of funding, the securities were sold to the investors with conveyance of ownership of the "Loan" product purchased by Bailey, and the transfers claimed by "successor" parties all occurred AFTER the conveyance was effective in favor of the investors. Since the loans were conveyed before the transfers for good consideration, I conclude that none of the other parties posses any title, color of title, or claim under the note and mortgage executed by Bailey.

14.    Further, the award of title to any of these other parties would be in derogation of the title and claims of the investors who are the only and actual sources of funding/consideration. The interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation were purportedly transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. In my opinion, the "Lender" in securitized loans is only a nominee for an undisclosed principal. The transaction with the homeowner is subject to a pre-existing contractual relationship wherein the investors advanced the cash for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers (not protected by attorney client privilege or the attorney work product privilege) in which they have been informed that any nominee that does not advance

18

cash for funding the loan and does not receive any payments on the obligation in particular allows multiple parties to make claims on the same property from the same borrower, using the same note and the same security interest.

14.1.    The intended monetary effect of the use of such a nominee was to provide obfuscation of profits and fees that were disclosed neither to the investor who put up the money nor to the borrower in this LOAN. In the case at bar, it is my opinion based upon a reasonable degree of certainty (beyond more likely than not) that the total fees and profits generated were actually in excess of the principal stated on the note --- which is to say that investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.

14.1.1.    The only way this could be accomplished was by preventing both the borrower and the investor from accessing the true information, which is why the industry practice of nominees like the private MERS system were created.  Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services". Therefore it is possible and even probable that the data from the closing was entered into the MERS electronic registry and that an assignment was executed to MERS purportedly giving MERS some power over the obligation, the note and/or the encumbrance. As a general rule in securitized transactions and especially where MERS is named as nominee, documents of transfer

19

(assignments, endorsements, etc.) are created and executed contemporaneously with the notice of default thus selecting a participant in the securitization chain to be the party who initiates collection and foreclosure.

15. The notice of default in the case at bar was in all probability substantially before any fabrication or creation of documents of transfer and before any such documents were recorded. Further it does not appear that any such documents were executed in recordable form under the laws of the State and in accordance with the local administrative rules governing recordation of instruments that purport to show an interest in real estate. Hence it is my opinion, as above, that the existence of any document of transfer in this case is inconsistent with the authority – apparent or actual --- to execute same without some additional documentation establishing a foundation for the document of transfer (assignment, endorsement etc.). No such document having been produced the inescapable conclusion is that no authority exists and that if permitted to move forward with a foreclosure or foreclosure sale, a title defect would be created beyond the current cloud on title, thus rendering the title permanently unmarketable without the entry of a court order from a court of competent jurisdiction declaring the rights of all stakeholders --- potential and otherwise. This opinion should not be construed to deny the existence or validity of the note, mortgage or underlying obligation. It is meant solely to convey the opinion that none of the existing parties known to the homeowner have any authority, apparent or otherwise, to declare the obligation in default or to pursue collection on

20

the only potential party to a foreclosure wherein the purported creditor alleges financial injury and therefore a right to collect the obligation, enforce the note or enforce the security instrument is either a party who has actually advanced cash and stands to lose money or an authorized representative who can disclose the principal, provide proof of service or notice, and thus show such authority.

17. In my opinion, as above, and with a reasonable degree of factual and legal certainty, the disclosed principals in the securitization chain are not the Lender(s) nor are they agents for the Lender(s). In my opinion, as stated in this paragraph, these parties are interlopers or impostors whose design is to take title to property they have no right to claim, and to enforce a note which is evidence of an obligation that is not owed to them but rather to another. The details of this information, whether the special purpose vehicle still exists, whether the investor(s) has been paid in full through federal or insurance payment, are known only to these securitization participants.

18. In my opinion the attorneys for the known securitization participants do not have any authority to represent the Creditors, and could not represent them due to the obvious conflict of interest, to wit: the investor(s) upon learning that a substantial amount of their advance of cash was pocketed by the intermediaries and now is left with a mortgage whose nominal value is far below what was paid, and whose fair market value is far below the nominal value, would have potential substantial claims against the securitization participants for fraud, breach of contract, and other claims.

19. I have also reviewed, for the past 40 years, published Financial Accounting

22

Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit, which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet (or on the ledgers used to prepare the balance sheet) but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization participant in this case.

20.     In my opinion, with a high degree of certainty, the Plaintiff/Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Plaintiff/Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Lender

23

as beneficiary under the Mortgage Deed as distinct from a third party named as Payee on the promissory note and the same or other third party named as beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

FURTHER, AFFIANT SAYETH NAUGHT.

     Signed on January 17, 2010

     /s/ Neil Franklin Garfield, Esq.

———————————————

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Plaintiff and Debtor in Pro Per*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11<br>BK Case #: 2:09-bk-06979-PHX-RTBP<br>AP Case # 2:09-ap-01731-RTBP |
| ANDREW C. BAILEY<br>Plaintiff | |
| | **DEBTOR'S FIRST SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** |
| Vs | |
| | (Related to Docket #7) |
| WELLS FARGO BANK, NA<br>Defendant | Subject Property:<br>2500 N Page Springs Rd<br>Cornville, AZ 86325 |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

## AND FIRST REQUEST FORPRODUCTION OF DOCUMENTS

Pursuant to Rule 33 and Rule 34 of the Federal Rules of Civil Procedure, Plaintiff requests

that Defendant answers the following Interrogatories and produces documents in

accordance with the following Request for Production of Documents.

## DEFINITIONS

1. WELLS FARGO BANK NA includes any and all persons and entities presently or

formerly acting for or in concert with WELLS FARGO BANK NA.

2. LEHMAN BROTHERS BANK FSB includes any and all persons and entities presently

Exhibit C

or formerly acting for or in concert with LEHMAN BROTHERS BANK FSB.

3. "Document" includes each record held in WELLS FARGO BANK NA'S possession or generated by WELLS FARGO BANK NA.

4. The word "document(s)" includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, and should be construed in the broadest sense permissible. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "document(s)" includes the original and any non-identical copy and also every draft and proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition, the word "Document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "e-mail," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files.

5. The word "person(s)" includes not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trusts, groups, and organizations; federal, state, or local

governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof.

6. As used herein, any reference to any "person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries, affiliates, divisions, and predecessors and successors in interest.

7. The words "you," "your", "defendants" or "movants" refer to defendants, defendant-intervenors, movants, and their agents, representatives, attorneys, experts, and all other persons acting or purporting to act on behalf of Movants.

8. The singular of each word shall be construed to include its plural and vice versa, and the root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to include each other.

9. The words "and" as well as "or" shall be construed both conjunctively as well as disjunctively.

10. The word "each" shall be construed to include "every" and vice versa.

11. The word "any" shall be construed to include "all" and vice versa.

12. The present tense shall be construed to include the past tense and vice versa.

13. The masculine shall be construed to include the feminine and vice versa.

14. The words "knowledge," "information," "possession," "custody," and "control" of a person shall be construed to include such person's agents, representatives, and attorneys.

15. The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and shall not indicate limitation to the examples or items mentioned.

16. The phrase "reflect, refer, or relate to" means reflecting, referring to, relating to, regarding, discussing, concerning, constituting, mentioning, pertaining to, alluding to, or associated with.

17. The words "to present" mean to the date on which you respond to these interrogatories and requests.

**INSTRUCTIONS**

1. Unless otherwise specified, if your response in regard to a portion of the time period addressed in any interrogatory differs from your response in regard to another portion of such period, provide a response for each such portion and indicate the period of time to which each response relates.

2. Deem any reference to a non-natural person to include the legal predecessors of such non-natural person.

3. When an interrogatory asks you to "describe" or "identify" a document, provide the following information with respect to each such document:

a. The date appearing on such document; or if it has no date, so state and give the date or approximate date such document was prepared, produced, created, or came into being;

b. Any identifying or descriptive code number, file number, title or label of such document;

c. The general nature or description of such document;

d. The name of the person(s) who signed, authored, produced or created such document;

e. The name of the person(s) who prepared such document if different from the name provided pursuant to subpart (d) of this instruction;

f. The name of the person(s) to whom such document was addressed and the name of each such person other than the addressee to whom such document, or copy or reproduction thereof, was given or sent;

g. The name of the person or entity having present possession, custody and/or control of such document;

h. The present location of such document;

i. If such document was, but is no longer in your possession or control, state what

disposition was made of such document, the reason for such disposition, and the date thereof.

j. Whether or not any draft, copy, or reproduction of such document contains any script, notation, change, addendum, or the like, not appearing on such document itself, and if so, the answer shall give the description and identification of each such draft, copy or reproduction in accordance with the above subparts (a) through (i).

4. The above information shall be given in sufficient detail to enable any person or party to whom a subpoena or request for production is directed to identify the documents sought to be produced and to enable counsel to determine whether such document, when produced, is in fact the document so described and identified.

5. Notwithstanding any other instruction in this First Set of Interrogatories that is or may be to the contrary, if a document has already been produced by you to the Plaintiff, such document may be identified by specifying the Bates numbers for all pages of such document.

6. A request that you identify a document is not limited to documents within your possession, and such requests shall extend to all documents under your control.

7. When an interrogatory asks you to "identify" a person, the answer shall contain the following information with respect to each such person:

a. The full name, current or last known business and residence addresses, and business and residence phone numbers of such person;

b. The name and address of the agency, employer or entity at which such person worked and/or to which such person reported;

c. The title(s) and related periods of service for such person with each such agency, employer or entity.

8. When an interrogatory calls for the "description" or "identity" of any "document" you

contend to be subject to a privilege against disclosure in response to these interrogatories, provide with respect to each such document or communication the following:

a. The nature of the document you contend is privileged (*e.g.*, letter, memorandum, chart, picture, report, etc.);

b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.* Bates numbers) if any, on the document;

c. The date of the document which you contend is privileged;

d. The name(s) of the author(s) and of any recipient(s) of the document;

e. The name and address of any person who is not included in your response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document that you contend to be privileged; and

f. The nature of the privilege asserted.

9. In answering each of these interrogatories, furnish all information available to you that is relevant or that might lead to the discovery of relevant evidence, including information in the possession of your attorneys, or their investigators, and all persons acting on your behalf, including but not limited to your employees, agents, officers, or representatives. If you are unable to answer these interrogatories in full after exercising due diligence to supply a complete answer, so state and answer to the extent possible. Specify the reasons for your inability to answer and state whatever information or knowledge you have concerning the unanswered portions.

10. For each interrogatory or part of an interrogatory that you refuse to answer on grounds of burdensomeness, explain in as much detail as possible the basis for your refusal.

11. These interrogatories are deemed to be continuing; as such, you are requested to file and serve by way of supplemental answers thereto such additional information as may be required to complete your answers to these interrogatories.

**INTERROGATORIES**

Where applicable, with respect to your answer to each of these interrogatories, please:

A. identify each person on whose testimony you will or may rely in support of your answer;

B. identify each document on which you will or may rely in support of your answer.

    1. State the name, job title and business address of each person providing information in response to these discovery requests:

    2. State the type of business organization WELLS FARGO BANK NA is, and name each State of the Union in which WELLS FARGO BANK NA is chartered or registered:

3. State the name, job title, and business address of each person who has first-hand personal knowledge of the time and circumstances under which the promissory note obligating Andrew C. Bailey and/or alienable in this instant case was created, sold, transferred and/or assigned for value:

4. State the name and contact information of the creditor in the instant case.
   (NOTE: The creditor is the person who actually provided the money for the subject Transaction in expectation of payment, and who stands to lose money in the event of default.)

1
2
3

5. State the names and contact information of all persons or entities, in order of assignment, who at any time were constructive holders or holders in due course of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

4
5
6
7
8
9
10

6. State the name and contact information of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

11
12
13
14
15
16
17

7. If the name of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case in Item (6) above is different from your name (WELLS FARGO BANK NA), explain why the Order prepared by you and signed by Honorable Judge Redfield T. Baum on October 2, 2009 states "WELLS FARGO BANK NA is the current beneficiary":

18
19
20
21
22
23
24
25

1

2   8.Explain why the alleged copy of the promissory note submitted as Exhibit "A"
        attached to Defendant's Motion for Lift from Stay includes no allonge or
3       endorsement showing any assignment of the note to WELLS FARGO BANK NA:

4

5

6

7

8

9

10

11

12

13   9. If WELLS FARGO BANK NA did not keep or cannot produce a copy of an allonge
        or other paper showing assignment to WELLS FARGO BANK NA of the
14      promissory note obligating Andrew C. Bailey and/or alienable in this instant case,
        explain why.
15

16

17

18

19

20

21

22

23

24

25

10.    Identify the name, address and telephone number of each person or entity likely to have discoverable information relevant to the foregoing or that you may use to support your action.

**REQUEST FOR PRODUCTION OF DOCUMENTS**

Plaintiff hereby requests that Defendant WELLS FARGO BANK NA produce the following documents for inspection and copying within 30 days of service of this request, or any earlier date on which the parties agree, subject to the foregoing Definitions and Instructions set forth above, at the offices of the Yavapai County Recorder, 6th Street, Cottonwood, AZ or at another location agreeable to the parties hereto.

1. Produce the <u>original</u> promissory note signed by Andrew C. Bailey and/or alienable in this instant case. If none, state "none."

2. Produce all documents identified by you in response to each interrogatory set forth above. If none, state "none".

3. Produce all documents associated with WELLS FARGO BANK NA's August 14, 2008 transfer and assignment of all beneficial interest in the promissory note alienable in this instant case to LEHMAN BROTHERS BANK FSB. If none, state "none".

4. Produce a copy of the allonge or endorsement attached to the promissory note obligating Andrew C. Bailey and/or alienable in this instant case showing an assignment of the promissory note from LEHMAN BROTHERS BANK FSB or another person back to WELLS FARGO BANK NA. If none, state "none."

5. Produce any and all Pooling and Servicing Agreement or other contractual agreement or memo involved in the "securitization" of the subject promissory note. If none, state "none".

6. Produce the account and general ledger statement of each transaction WELLS FARGO BANK NA alleges Andrew C. Bailey has made with WELLS FARGO BANK NA with respect to the promissory note alienable in this instant case, showing all receipts and disbursements. If none, state "none".

7. Produce all bills of sale and allonges and agreements illustrating where the promissory note alienable in this instant case was sold or assigned for value, from inception to the present. If none, state "none".

8. Produce all insurance claim information and credit default claim or settlement or payment records relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

9. Produce all information pertaining to Federal TARP or other bailout settlements or payments relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

10. Produce all contracts, agreements, and/or memos illustrating that law firm Tiffany & Bosco, PA has authority to represent WELLS FARGO BANK NA in this instant case. If none, state "none".

11. Produce all contracts, agreements, and/or memos illustrating that WELLS FARGO BANK NA or its attorney law firm Tiffany & Bosco, PA has authority to represent the creditor in this instant case. If none, state "none".

12. Produce all documents or data compilations that are in your possession, custody or control that you may use in support of your action.

Respectfully submitted this 19th day of January, 2010

(Previously submitted in the administrative case on the 11th day of January, 2010)

Signed _____

Andrew C. Bailey, *Plaintiff and Debtor in Pro Per*

**CERTIFICATE OF SERVICE**

I, Andrew C. Bailey, certify that on the 22nd day of January, 2010, a true and correct copy of Plaintiff's First Set of Interrogatories and First Request for Production of Documents was served upon the attorney for Defendant by certified mail to:

Leonard McDonald, Esq,

Tiffany & Bosco, PA

2525 East Camelback Road, Suite 300

Phoenix, AZ 85016

(Attorney for Wells Fargo Bank NA)

Signed this 22nd day of January, 2010.

Andrew C. Bailey, *Plaintiff and Debtor in Pro Per*

WHEN RECORDED MAIL TO:

**TIFFANY & BOSCO, P.A.**
**Michael A. Bosco, Jr.**
2525 East Camelback Road, Suite 300
Phoenix, AZ 85016

FEE
$ 5
$8
$5
$1
$14 04

Ana Wayman-Trujillo, Recorder
OFFICIAL RECORDS OF YAVAPAI COUNTY
FIRST AMERICAN TITLE INS    AODT

B-4616 P-292
08/18/2008 03:51P
14.00  4257662

B-4616 P-292
Page: 1 of 2
AODT    4257662

AUG 4, 2008

## ASSIGNMENT OF DEED OF TRUST

Loan No. 0152325825
Parcel No.

T & B No.: 08-46763

For Value Received, the undersigned corporation hereby grants, assigns and transfers to **Lehman Brothers Bank, FSB** at the address of c/o ASC, 3476 Stateview Blvd, Fort Mill, SC 29715 all beneficial interest under that certain Deed of Trust dated **June 9, 2006** executed by **Andrew C. Bailey and Constance Baxter Marlow** Trustor, **First American Title Insurance Company** Trustee, **Wells Fargo Bank, N.A.**, as Beneficiary; and recorded on **June 23, 2006** as Instrument No./Docket-Page No. **4409-655** of Official Records of **Yavapai** County, AZ and legally describing the trust property as:

**Parcel I:** A portion of the Southeast quarter of Section 15, Township 16 North, Range 4 East of the Gila and Salt River Base and Meridian, Yavapai County, Arizona, more particularly described as follows: COMMENCING at the Southeast corner of said Section 15; THENCE North 89°57'49" West along the Southerly boundary of said Section 15, a distance of 495.31 feet to the Westerly right of way line of the Page Springs Road and the TRUE POINT OF BEGINNING; THENCE continuing North 89°57'49" West, a distance of 414.11 feet; THENCE North 12°47'43" West, a distance of 293. 12 feet; THENCE South 89°57'49" East, a distance of 292.28 feet to a point on the Westerly right of way line of the Page Springs Road; THENCE Southeasterly, along said right of way line on a curve to the left, having a radius of 749.00 feet, through a central angle of 15°51'22", a distance of 207.33 feet; THENCE South 37°56'23" East, along said right of way, a distance of 135.61 feet to the TRUE POINT OF BEGINNING.

**PARCEL II:** AN EASEMENT for ingress and egress described as follows: COMMENCING at the Southeast corner of said Section 15; THENCE North 89°57'49" West, along the Southerly boundary of said Section 15, a distance of 1303.17 feet; THENCE North 07°17'21" East, a distance of 288.10 feet; THENCE South 89°57'49" East, a distance of 272.98 feet to the TRUE POINT OF BEGINNING; THENCE North 39°02'54" East, 356.01 feet; THENCE South 89°57'49" East, a distance of 31.21 feet; THENCE South 03°33'23" East, a distance of 30.06 feet; THENCE North 89°57'49" West, a distance of 18.79 feet; THENCE South 39°02'54" West, a distance of 317.40 feet; THENCE North 89°57'49" West, a distance of 38.60 feet to the TRUE POINT OF BEGINNING of said Access Easements.

Together with the Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust

Date : August 14, 2008

**Wells Fargo Bank, NA**

Exhibit D

By : Mark S. Bosco, Attorney at Law
By Limited Power of Attorney

STATE OF Arizona      )

                          )ss.

COUNTY OF Maricopa   )

B-4616 P-292
Page: 2 of 2
RODT 4267662

On this 14th day of August, 2008, before me, the undersigned, a Notary Public for said State, personally appeared Mark S. Bosco, Attorney at Law known to me to be the By Limited Power of Attorney of the above corporation, and acknowledge execution of the above instrument on behalf of the corporation.

My Commission Expires:

_____
Notary Public



OFFICIAL SEAL
PAULA GRUNTMEIR
NOTARY PUBLIC   State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 23, 2011

**SEAL**